125 F.3d 1110
 Anthony DeSILVA, Albert DeSilva, Anthony J. LoBue, and
Thomas Kulekowskis, Petitioners-Appellees,
v.
Joseph G. DiLEONARDI, United States Marshal for the Northern
District of Illinois, Respondent-Appellant.
 Nos. 96-4110, 97-1038.
 United States Court of Appeals,
Seventh Circuit.
 Argued May 22, 1997.
Decided Sept. 26, 1997.
Rehearing and Suggestion for Rehearing En Banc Denied Nov. 26, 1997.
 
 Michael J. Howlett, Jr., Patricia Susan Spratt, James D. Wilson, Shefsky, Froelich & Devine, Chicago, IL, Gregory B. Craig, Matthew J. Herrington, John T. Parry (argued), Williams & Connolly, Washington, DC, for Thomas Kulekowskis and Anthony J. Lobue.
 William A. Barnett, Jr., Chicago, IL, Anthony DeSilva.
 Joel D. Bertocchi (argued), Office of the United States Attorney, Criminal Division, Chicago, IL, Joseph G. DiLeonardi.
 Lawrence E. Morrissey, Chicago, IL, Albert DeSilva.
 Before COFFEY, EASTERBROOK, and ROVNER, Circuit Judges.
 EASTERBROOK, Circuit Judge.
 
 
 1
 Tammy DeSilva barely survived a serious car accident in December 1987. She became a quadriplegic and suffered serious brain damage. Three months after the accident an Illinois court declared her disabled, see 755 ILCS 5/11a-2(a), and named her husband Anthony as her guardian. Tammy's father, Ernest Wright, had sought the position, but the state judge understood Illinois law to forbid the appointment of foreign nationals as guardians. 755 ILCS 5/11a-5(a). Like Tammy, Ernest Wright is a citizen of Canada.
 
 
 2
 Anthony looked after Tammy during the 16 months following the accident. In July 1989, however, with medical bills mounting and insurance exhausted, he returned Tammy to Winnipeg, the Wright family's home. There she could receive subsidized health care. Tammy's parents tended her for the next 30 months, living with her in a house that Anthony and Tammy jointly owned. Anthony visited once. Back in Illinois, he initiated litigation seeking damages for Tammy's injuries. The litigation required Tammy to undergo a medical examination. Anthony feared that Tammy's parents would not permit him to return Tammy to Chicago for this purpose. He secured an order from an Illinois court authorizing him "to take custody of the person of Tammy DeSilva, wherever she may be found, for the purpose of presenting her to a physician or medical care provider for evaluation, treatment or assessment." With this order in hand, Anthony set off for Canada, accompanied by his father Albert, two off-duty Chicago police officers (petitioners Kulekowskis and LoBue), and a registered nurse. The group arrived at the home in Winnipeg at 6:40 a.m. on February 3, 1992.
 
 
 3
 What we have recounted so far is uncontested. Other events, and the inferences to be drawn, remain in dispute. Anthony contends that after a "brief and non-violent" discussion with Tammy's mother (Christina Wright), he and his companions carried Tammy to the car and drove back to the border. Tammy "appeared happy to see her husband and content to accompany him, and she indicated no disagreement." Christina Wright called the police and reported an abduction; in response, U.S. customs officials stopped the group at the border. When asked whether she wished to go to Chicago or stay with Anthony, Tammy was indecisive: through her keyboard communication device, she answered, "I want to go home with Anthony if it is OK" but also said that she wished to be with her mother. Customs officials ultimately sent Tammy back to Canada and admitted Anthony and his group to the United States.
 
 
 4
 Christina Wright, in contrast, says that Kulekowskis and LoBue barged in without asking permission and disconnected the telephone line while Anthony and the nurse carried Tammy away "crying and kicking." The Government of Canada believes that, at the border, Tammy protested through her communication device that she did not want to go to Chicago with Anthony "[b]ecause it is not home," that Anthony had told her that they were just going "for a ride", and that she would rather live with her mother than with Anthony. When communicating with two Winnipeg police officers, she asked whether "Anthony was doing this for money". Canada also believes that when entering the country the group told customs officials that they were traveling to Winnipeg to attend a surprise anniversary party for Anthony's wife. They did not mention the court order or their plan to remove Tammy from the country.
 
 
 5
 The Province of Manitoba commenced a criminal proceeding, alleging that the two DeSilvas, Kulekowskis, and LoBue violated Canadian national laws against kidnapping and forcible seizure. The Government of Canada asked the United States to surrender them for trial. The State Department initiated the necessary proceedings. 18 U.S.C. § 3184. Magistrate Judge Bobrick concluded that the evidence, viewed in Canada's favor, requires extradition. In re Extradition of Kulekowskis, 881 F.Supp. 1126 (N.D.Ill.1995). Petitioners then sought writs of habeas corpus. District Judge Lindberg issued writs with respect to three of the petitioners, holding that Anthony's status as Tammy's custodian would have permitted Anthony to do what he did, if Tammy had been in the United States, and that the "dual criminality" requirement of the treaty with Canada therefore precludes extradition. 941 F.Supp. 741 (N.D.Ill.1996). District Judge Shadur then issued a writ in favor of the group's fourth member, noting in a short opinion that he agrees with Judge Lindberg's legal conclusions. We have consolidated the appeals from these decisions.
 
 
 6
 Extradition depends on probable cause to believe that petitioners committed an offense covered by the extradition treaty. Bovio v. United States, 989 F.2d 255, 258 (7th Cir.1993); Eain v. Wilkes, 641 F.2d 504, 507-08 (7th Cir.1981). We cannot resolve factual disputes; for that matter, we cannot address most legal issues pertinent to the charges. Affirmative defenses not specified in the treaty may not be considered. Charlton v. Kelly, 229 U.S. 447, 33 S.Ct. 945, 57 L.Ed. 1274 (1913); Collins v. Loisel, 259 U.S. 309, 42 S.Ct. 469, 66 L.Ed. 956 (1922). "The alleged fugitive from justice has had his hearing and habeas corpus is available only to inquire whether the magistrate had jurisdiction, whether the offence charged is within the treaty and, by a somewhat liberal extension, whether there was any evidence warranting the finding that there was reasonable ground to believe the accused guilty." Fernandez v. Phillips, 268 U.S. 311, 312, 45 S.Ct. 541, 542, 69 L.Ed. 970 (1925) (Holmes, J.); see also Eain, 641 F.2d at 508.
 
 
 7
 Following the chain of inquiries established by Fernandez, we first examine the magistrate judge's jurisdiction. The hearing was held in this case in response to the State Department's decision to respect Canada's request that petitioners be surrendered for trial. Section 3184, which has existed in roughly the same form since 1878, provides thatany justice or judge of the United States, or any magistrate authorized so to do by a court of the United States, or any judge of a court of record of general jurisdiction of any State ... shall certify the [charge], together with a copy of all testimony taken before him, to the Secretary of State, that a warrant may issue upon the requisition of the proper authorities of such foreign government, for the surrender of such person, according to the stipulations of the treaty or convention[.]
 
 
 8
 The magistrate judge certified the charges under § 3184 and left to the Secretary of State the ultimate decision whether to honor Canada's request. Petitioners submit that § 3184 violates Article III of the Constitution and the doctrine of separation of powers "by requiring federal courts to give advisory opinions that are subject to plenary review and revision by the Executive branch." They first raised this argument in an independent action, and a district judge concluded that § 3184 indeed violates Article III, Lobue v. Christopher, 893 F.Supp. 65 (D.D.C.1995), but the court of appeals vacated this decision after concluding that the district court itself lacked jurisdiction. A constitutional objection to extradition must be made in the original extradition proceeding, or in a petition for a writ of habeas corpus, the court of appeals held. 82 F.3d 1081 (D.C.Cir.1996).
 
 
 9
 An argument that certification for extradition is an advisory opinion does not have much force, as magistrate judges do not serve under Article III of the Constitution and therefore are free to issue advisory opinions if a statute requires that step. The current proceeding--the quest for writs of habeas corpus--is anything but advisory. If the writ issues, it must be obeyed. But even the proceeding before the magistrate judge was an Article III case or controversy. A certificate of extradition is no different from a search warrant or an order approving a deportation: it authorizes, but does not compel, the executive branch of government to act in a certain way. The police may change their mind about the need for a search; the Board of Immigration Appeals may grant the alien's request for reopening. The Constitution itself allows the President to block enforcement of a criminal judgment by issuing a pardon. Judgments give victorious litigants rights but not duties; only the losers are placed under obligations, and a judgment may be called "advisory" only when it does not bind the unsuccessful litigant. A victor in civil litigation may forego collecting the award of damages; no one thinks that this makes the judgment advisory. The police need not search, the Attorney General need not deport, the victorious plaintiff need not collect--and the Secretary of State need not extradite. A federal court had the constitutional authority to certify the petitioners for extradition. Accord, Lo Duca v. United States, 93 F.3d 1100 (2d Cir.1996) (reaching the same conclusion by a different route).
 
 
 10
 The second question under Fernandez is whether "the offense charged is within the treaty". Under Article 2 of the extradition treaty between the United States and Canada, "[e]xtradition shall be granted for conduct which constitutes an offense punishable by the laws of [Canada and the United States] by imprisonment or other form of detention for a term exceeding one year or any greater punishment." If there is probable cause to believe that Anthony and his assistants committed a crime in Canada, and there is probable cause to believe that the conduct would have been criminal if committed in the United States, then extradition is appropriate. This is the "dual criminality" requirement. We focus on domestic law: "unless a plausible challenge is raised by the person sought, the authorities in the requested state will presume that the acts alleged constitute a crime under the law of the requesting state, and will consider whether the acts alleged constitute a crime under the law of the requested state." Restatement (3d) of the Foreign Relations Law of the United States § 476 comment d (1987); see also In re Assarsson, 635 F.2d 1237, 1244 (7th Cir.1980) (discussing the dangers of delving into foreign law). If the acts of the accused are considered criminal in both nations, extradition follows even if the requesting country does not have a criminal statute analogous to the one that makes the acts criminal in the United States. Collins, 259 U.S. at 312, 42 S.Ct. at 470-71; Eain, 641 F.2d at 508; Lo Duca, 93 F.3d at 1111-12; United States v. Levy, 905 F.2d 326, 328 (10th Cir.1990). Acts are considered criminal "in this country" if they would be unlawful under federal statutes, the law of the state where the accused is found, or the law of the preponderance of the states. Wright v. Henkel, 190 U.S. 40, 61, 23 S.Ct. 781, 786, 47 L.Ed. 948 (1903); Hu Yau-Leung v. Soscia, 649 F.2d 914, 918 & n. 4 (2d Cir.1981).
 
 
 11
 We very much doubt that Illinois would look with equanimity on someone who tried to remove a disabled person from the state to a foreign country, on the basis of an ex parte order issued by a foreign judge purporting to authorize acts within the territory of the United States--or for that matter on the basis of a guardianship proceeding from which U.S. citizens were automatically excluded. There is no international doctrine of full faith and credit ("comity" is some distance short of the legal obligation established by 28 U.S.C. § 1738), and the kind of orders involved here would not necessarily have been enforced even within the United States. But we need not pursue the subject. One federal criminal statute is the only law we need discuss.
 
 
 12
 The federal kidnapping statute provides that
 
 
 13
 [w]hoever unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holds for ransom or reward or otherwise any person, except in the case of a minor by the parent thereof, when--
 
 
 14
 (1) the person is willfully transported in interstate or foreign commerce;
 
 
 15
 ...
 
 
 16
 shall be punished by imprisonment for any term of years or for life....
 
 
 17
 18 U.S.C. § 1201(a). Kidnapping under this statute has four elements: (1) transportation in interstate or foreign commerce, (2) of an unconsenting person who is (3) held for ransom, reward, or otherwise, accompanied by (4) a mental state of knowledge or willingness. See United States v. Hernandez, 106 F.3d 737, 738 n. 1 (7th Cir.1997) (noting slight variations among the circuits in expressing these elements); United States v. Lewis, 115 F.3d 1531 (11th Cir.1997); United States v. Osborne, 68 F.3d 94 (5th Cir.1995). The only issue contested in this case is whether Tammy was "an unconsenting person" within the meaning of § 1201(a). We must assume that Tammy did not agree to being removed from Winnipeg. Anthony nonetheless contends that because he is Tammy's guardian, he could consent on her behalf. Alternatively, petitioners submit that the guardianship conclusively establishes that Tammy is unable to exercise any will of her own, and therefore could not have refused to consent, any more than a minor child can block a parent's decision to move the family to another state or country.
 
 
 18
 Both variations of this line of argument run smack against a line of cases led by Chatwin v. United States, 326 U.S. 455, 66 S.Ct. 233, 90 L.Ed. 198 (1946), which holds that consent can be given (and liability under § 1201(a) therefore avoided) even when state law deems the person transported to be incapable of making an independent choice. Chatwin dealt with consent given; its approach is equally applicable to consent withheld. According to Chatwin and its successors, the federal court must decide whether the alleged victim was competent to exercise a rational will. See United States v. Macklin, 671 F.2d 60 (2d Cir.1982) (13 and 11 year olds capable of giving or withholding consent); Eidson v. United States, 272 F.2d 684 (10th Cir.1959) (11 year old; same conclusion). A guardianship order may show that a state judge believed that the ward lacks the mental capacity to give or refuse consent, but what a state judge believes is not conclusive in the federal prosecution.
 
 
 19
 The magistrate judge found that the evidence would permit a trier of fact to conclude that Tammy could exercise a rational will, and that she communicated a desire to remain in Winnipeg. If that is true, then Anthony's conduct, had it occurred in the United States, would have violated § 1201(a). Chatwin held that a 15-year-old girl with a mental age of 7 was sufficiently rational to give or withhold consent for purposes of § 1201(a). Evidence in the record could support a conclusion that Tammy possesses at least that much mental acuity, that she resisted Anthony when he took her from her home, and that she communicated intelligibly and rationally with U.S. customs officials when they asked her to choose between returning to Winnipeg or traveling with Anthony to Chicago. Petitioners will have an opportunity to make their arguments to the contrary at trial in Canada.
 
 
 20
 Anthony contends that, as Tammy's guardian, he was free to override her wishes. What else are guardians for? Can a father be brought to trial on a charge of kidnapping if he takes his child with the family from one state, or one country, to another? The answer to this question turns out to be murkier than the district court thought. Polovchak v. Meese, 774 F.2d 731 (7th Cir.1985), holds that parents who are citizens of another country cannot remove their own child from the United States to their native land, over the child's objection, unless the child first is afforded a hearing to determine whether living in another nation is in the child's interests. Walter Polovchak was only 12 when he balked at his parents' desire to return home, but we held that this was not conclusive.
 
 
 21
 Had Mr. and Mrs. Polovchak dragged Walter out of the United States, their act would not have been "kidnapping" because § 1201(a) does not criminalize the transportation of "a minor by a parent thereof". Originally the statute did not contain this exception but covered only abductions for "ransom or reward". It was amended in 1934 to include all involuntary interstate movement "for ransom or reward or otherwise"; the parental exception was part of this amendment. For a discussion of the history, see United States v. Sheek, 990 F.2d 150, 151-52 (4th Cir.1993). Congress did not add a similar exception for guardians of adult wards. Thus even though states may authorize guardians to ignore, within their borders, the wishes of a person adjudicated "disabled" or "incompetent," the national government requires a decision using a standard that looks at the actual mental abilities of a person being transported across state lines. Under the supremacy clause of the Constitution, the view of the federal government prevails to the extent these intra-state and inter-state rules conflict. A guardian who moves an adult ward across state or national boundaries, against her will, therefore may be convicted of kidnapping.
 
 
 22
 Petitioners unsuccessfully argued before the magistrate judge that Manitoba lacks probable cause to believe that Canadian law had been violated. This argument has been abandoned. Because the dual-criminality argument is unsound, writs of habeas corpus should not have been issued.
 
 
 23
 REVERSED.