**In the Matter of the EXTRADITION OF Sandor MOLNAR.**

**No. 02 M 0005.**

United States District Court,
N.D. Illinois,
Eastern Division.

May 10, 2002.

---

David Weisman, Asst. U.S. Atty., Chicago, IL, for Plaintiff.

Piyush, Chandra, Chicago, IL, for Defendant.

### MEMORANDUM ORDER

BOBRICK, United States Magistrate Judge.

Before the court is the memorandum of law of the United States in support of the extradition of Hungarian citizen Sandor Molnar to the Republic of Hungary pursu-

ant to the Treaty Between the Government of the United States of America and the Government of the Republic of Hungary on Extradition, May 8, 1995, U.S.–Hung., 1994 WL 855132 ("Treaty").

On January 9, 1998, defendant Sandor Molnar was working as a telephone company security guard watching a truck in Balassagyarmat, Hungary. Sometime that evening, defendant left the truck and went to a bar with his girlfriend, where they consumed alcoholic beverages. The two of them returned to the truck, whereupon defendant began kicking it. This drew the attention of two local police officers who approached in an unmarked private vehicle and, while not identifying themselves as policemen, told defendant to stop kicking the truck. After an argumentative response from defendant, the officers exited their vehicle. They were not wearing full police uniforms or caps, only dark trousers and pullovers with epaulets with gold markings identifying their police rank. They wore sidearms in holsters. In the meantime, defendant entered the truck, retrieved a gun that he had then unloaded—which he was licensed to carry as a security guard—and aimed it at one of the officers, asking them "what kind of security guards are you?" One of the officers disarmed him and, apparently simultaneously, identified himself and his partner as police officers. He then discovered that the gun was not loaded. The officers also determined, at the time, that defendant was under the influence of alcohol. They arrested him and brought him before a Magistrate/Prosecutor, who concluded that criminal action against defendant was not appropriate as it could not be determined without a shadow of a doubt that defendant knew the two men were officials. Without proof of such knowledge, the offense of "violence against an official" cannot be established. The Magistrate/Prosecutor discontinued the investigation on February 28, 1998.

The municipal police initiated an appeal, which was first rejected at the municipal level, then upheld at the county level on April 16, 1998. At the county level, the court was swayed by defendant's statement that he knew the two men were in uniform, and should have realized they were police officers, given his profession. This was corroborated by the statement of defendant's girlfriend. As a result, an indictment issued against defendant on May 11, 1998, for the criminal offense of "use of force against an official person." The relevant statute provides:

(1) Whoever impedes an official in his lawful proceedings by duress or threat, compels him to take measures, or in the course of his proceedings, or in consequence of the proceedings, assaults him, commits a crime and is punishable with deprivation of liberty up to three years.
(2) The punishment is deprivation of liberty up to five years, when violence against an official is committed in a gang or armed.

Section 229, Act IV of 1978 Criminal Code ("Hungarian Criminal Code"). During the appellate proceedings, defendant left Hungary and came to the United States, under a lawful visa, seeking work. Consequently, charges against him were suspended.

The charges were revisited June 22, 2001, at which time the two officers appeared at a hearing and testified. (*City Court of Balassagyarmat, Minutes of June 22, 2001*). Their testimony, some three years removed from the events in question, differed somewhat from their previous statements. According to Officer Csaki, they identified themselves as police officers and asked defendant to drop his weapon. (*Id.* at 6). When defendant refused, they disarmed him. (*Id.* at 6). Officer Csaki also allowed, however, that the encounter took place in a matter of seconds, and it was possible they did not have time to identify themselves before disarm-

ing defendant. (*Id.* at 4, 8). He also felt that defendant should have recognized them as policemen by their uniform, despite the fact they had no caps or jackets. (*Id.* at 4, 8–9). According to Csaki, defendant did realize they were security people of some kind, but "that the young man was not aware that we were policemen." He recalled the defendant stating at the time "Sorry, I did not know that you are policeman." (*Id.* at 9–10). Officer Szondy testified that they definitely identified themselves as policemen but, at the same time, the events took place in split seconds. (*Id.* at 13). In addition to the general description of their uniforms, Officer Szondy recalled that they were wearing distinctive badges which would be known to anyone as being police badges. (*Id.* at 14). Officer Szondy was of the opinion that defendant should have recognized that they were police officers. (*Id.* at 17).

The Republic of Hungary made a provisional arrest request under Article Eleven of the Treaty, and indicated that a regular diplomatic request for extradition of the defendant would be made in conformity with the Treaty, and would be presented to the court within 60 days from the date of defendant's provisional arrest. On January 9, 2002, defendant was taken into custody under the complaint, and subsequently released on bond. The Republic of Hungary filed authenticated extradition documents with the court on January 29, 2002, and the court convened an extradition hearing. The parties have now briefed the issues raised in the hearing.

## I. *DUAL CRIMINALITY*

The parties spend a great deal of time over the issue of "dual criminality," yet they agree that this doctrinal threshold is met in this case. (*Memorandum of law in Support of Extradition,* at 6; *Reply to Government's Memorandum,* at 1). It may be that there is confusion over the separate issues of dual criminality and probable cause. Extradition depends on probable cause to believe the defendant committed an offense covered by the extradition treaty. *DeSilva v. DiLeonardi,* 125 F.3d 1110, 1112 (7th Cir.1997). Under the Treaty, "[a]n offense shall be extraditable offense if it is punishable under the laws in both Contracting Parties by deprivation of liberty for a period of more than one year, or by a more severe penalty." Treaty, Article 2, Extraditable Offenses, § 1. This language essentially codifies the doctrine of dual, or double criminality. Under the doctrine of dual criminality, an accused can be extradited only if the alleged criminal conduct is considered criminal under the laws of both the surrendering and requesting nations. *DeSilva,* 125 F.3d at 1113; *Murphy v. U.S.,* 199 F.3d 599, 602 (2nd cir.1999); *Clarey v. Gregg,* 138 F.3d 764, 765 (9th Cir.1998), *cert. denied,* 525 U.S. 853, 119 S.Ct. 131, 142 L.Ed.2d 106 (1998). Alleged conduct is considered criminal in this country if it would be unlawful under federal statutes, the law of the state where the accused is found, or the law of the preponderance of states.[1]

1. The United States argues that federal law must be considered in the dual criminality analysis, submitting that 18 U.S.C. § 111, which criminalizes assaults on federal officials, is the appropriate statute for comparison with Hungarian law. (*Memorandum in Support of Extradition,* at 6–11). As indicated by case law, *supra,* there is no requirement that federal law be considered. Furthermore, in this instance, Illinois law is more closely analogous to Hungarian law. Unlike Hungarian law, the federal statute does not require the element of knowledge. In addition, its coverage is limited to assaults federal officials. The choice between federal and state law is really of no consequence here, however, as all that dual criminality requires is that the alleged conduct be criminal both here and in Hungary.

*DeSilva,* 125 F.3d at 1114. "The law does not require that the name by which the crime is described in the two countries shall be the same; nor that the scope of the liability shall be coextensive, or, in other respects, the same in the two countries. It is enough if the particular act charged is criminal in both jurisdictions." *Collins v. Loisel,* 259 U.S. 309, 312, 42 S.Ct. 469, 470–471, 66 L.Ed. 956 (1922).

■ Here, defendant is charged under Hungarian law with armed violence against an official. According to the United States, the Hungarian government has indicated that under Hungarian law the prosecuting authority would have to prove the defendant *knew* the person he was assaulting was a government official. In the end, then, defendant is charged with pointing a weapon—an unloaded weapon—at a person he knew was a government official. Under the law where defendant was found, Illinois law, the offense of aggravated assault is committed when a person:

> (1) Uses a deadly weapon or any device manufactured and designed to be substantially similar in appearance to a firearm, other than by discharging a firearm in the direction of another person, a peace officer,
>
> (6) Knows the individual assaulted to be a peace officer, or a community policing volunteer, or a fireman while the officer or fireman is engaged in the execution of any of his official duties, or to prevent the officer, community policing volunteer, or fireman from performing his official duties, or in retaliation for the officer, community policing volunteer, or fireman performing his official duties, and the assault is committed other than by the discharge of a firearm in the direction of the officer or fireman or in the direction of a vehicle occupied by the officer or fireman;

720 ILCS 5/12–2. Knowledge is a requirement of the offense, as it is in Hungary. Aggravated assault is punishable as a felony in Illinois. Accordingly, because defendant's alleged conduct would be similarly punishable under the laws of Illinois and Hungary, the dual criminality element is met.

## II. *PROBABLE CAUSE*

■ Having found the charged offense to be extraditable, we turn to the question of whether there is probable cause to believe defendant committed the offense. *DeSilva,* 125 F.3d at 1112. More specifically, here, given the facts of this case, we must determine whether there is probable cause to believe defendant acted with the requisite mental state, *DeSilva v. DiLeonardi,* 181 F.3d 865, 866 (7th Cir.1999), that he knew the men at whom he was pointing his empty gun were police officers. An extradition proceeding is not a trial, but rather is similar to a preliminary hearing to determine probable cause. *Bovio v. U.S.,* 989 F.2d 255, 259 (7th Cir. 1993). Accordingly, the court's inquiry here is whether there is evidence sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief in the guilt of the accused. *Jenkins v. Bowling,* 691 F.2d 1225, 1230 (7th Cir.1982); *In re Extradition of Salas,* 161 F.Supp.2d 915, 924 (N.D.Ill. 2001). The Treaty requires that the Republic of Hungary support its request for extradition with evidence sufficient to establish probable cause. Treaty, Article 8, Extradition Procedures and Required Documents, § 3(c) ("such information as would justify the committal for trial of the person if the offense had been committed in the Requested State.")

The United States argues that the Hungarian government has satisfied the requirement of probable cause by submitting the following sworn testimony of the two officers from the most recent hearing:

Specifically, both officers testified that they were conducting government business (*City Court of Balassagyarmat, Minutes of June 22, 2001*, at 15–16, 24) and were in uniform dress at the time they approached defendant. (*Id.* at 17, 27). They also warned defendant that they were police. (*Id.* at 23, 26). Further, both officers further testified that defendant pointed a gun at then as they approached him. (*Id.* at 18, 25–26). (*Memorandum of Law in Support of Extradition,* at 13). The United States' characterization of the testimony, however, is not entirely accurate.

■ The central issue here is whether there is probable cause to believe defendant knew the men he aimed his gun at were police officers. Contrary to the United States's summary of the evidence, the two officers did not simply testify that they were "in uniform dress" but that they were in partial uniform, without their caps or service jackets. Similarly, while Officers Csaki and Szondy seemed to recall warning defendant that they were police, they could not recall whether they warned him before or after he pointed the gun at them. Indeed, the officers testified that after defendant pointed the gun at them, he asked them "what kind of security guards are you?" The United States does not mention Officer Csaki's testimony that this question "show[ed] that the young man was not aware of that we were policemen." The best evidence Officer Szondy could offer was his opinion that defendant should have know they were policemen.

We cannot find probable cause here as this evidence is not sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief in the guilt of the accused. Indeed,

based on the officers' testimony, it appears that they themselves did not believe that defendant was acting with knowledge that they were policemen. Accordingly, we must deny the request for extradition of the defendant.

### III. *DOCUMENTATION*

One final matter bears some discussion. The Treaty requires that the country requesting extradition—here, the Republic of Hungary—file with the court "information describing the facts of the offense and the procedural history of the case," as well as "the text of the law describing the essential elements of the offense." Treaty, Article 8, Extradition Procedures and Required Documents, §§ 2(b), (c). In this case, the Republic of Hungary filed documentation—an international warrant of arrest and indictment charge sheet—describing the facts of the offense. As for the elements of the offense, although the Republic of Hungary submitted documentation quoting the applicable statute, the "elements of the offense" were not sufficiently described. The documentation did not mention the required element of knowledge; this was only learned later after the court inquired. As for procedural history, the Republic of Hungary provided this court with those two documents, as well as minutes of the hearing of June 22, 2001. None of these documents indicated that charges had initially been dropped nor that there had been two appeals in order to reinstate them. It was the defendant who provided this documentation to the court. He argues that the Republic of Hungary failed in its obligation to provide a procedural history of the case. The United States submits that the Treaty does not demand a complete procedural history[2] and, in any event, the

---

2. The United States indicates that, were the situation reversed, it would provide a Hun-

garian court with a similar amount of documentation. According to the United States:

court now has the information at its disposal. While the court need not rely on these documentation shortcomings to deny extradition, they proved to be a bit more than a technicality in this matter.

The required element of knowledge was a central focus of the Hungarian proceedings, as well as these proceedings. It should have been addressed in the Article 8 filing. Similarly, the procedural history of the case was not an ordinary one. Defendant was arrested and testimony was taken in January of 1998. Based on lack of evidence—again, as to defendant's *knowledge*—the prosecution was discontinued. Following the appellate process, testimony was again taken in 2001, three years later and charges were reinstated. Without the defendant's filings, this court would not have been aware of the tenor of the original proceeding and the testimony given immediately after the incident. Such factors can be significant in a court's assessment of probable cause where it can rely only on transcribed statement of the individuals involved. We have found there is no probable cause to believe defendant committed the offense with which he is charged in Hungary, but had we not, the deficiencies in the documentation would give us pause to allow extradition in any event.

## IV. *CONCLUSION*

For the foregoing reasons, the request for extradition is hereby DENIED.

For example, if a United States magistrate judge found lack of probable cause (dismissing the complaint) and the individual was later indicted, the magistrate judge's initial ruling would not be a necessary component of the procedural history to fully advise the Hungarian court that a valid indictment had been returned against the putative extraditee.
(*Memorandum of Law in Support of Extradition,* at 5).