**In the Matter of the EXTRADITION OF Bruce Ainsley BERESFORD–REDMAN.**

No. CR 10–2780M.

United States District Court, C.D. California.

Dec. 2, 2010.

William J. Genego, Jr., Richard G. Hirsch, Vicki I. Podberesky, Nasatir Hirsch Podberesky Khero & Genego, Santa Monica, CA, for Bruce Ainsley Beresford–Redman.

## ORDER GRANTING MOTION FOR DETENTION AND DENYING APPLICATION FOR BAIL (Docket No. 6)

SUZANNE H. SEGAL, United States Magistrate Judge.

## I.

## INTRODUCTION

On November 12, 2010, the United States of America ("the United States") filed a Complaint for Provisional Arrest with a View Towards Extradition (the "Complaint") pursuant to 18 U.S.C. § 3184. The Complaint alleged that Bruce Ainsley Beresford–Redman ("Beresford–Redman") had been charged in the State of Quintana Roo, Mexico with aggravated homicide as described by articles 86, 106(I) and 14, and punishable under article 89 of the Penal Code of the State of Quintana Roo. (Complaint at 2, ¶ 5). The Complaint further alleged that aggravated homicide is an extraditable offense under Article 2, Paragraph 1 of the Extradition Treaty between the United States and Mexico, and Item 1 of its Appendix. (*Id.* at 10, ¶ 7). Finally, the Complaint alleged that Beresford–Redman was at large in the Central District of California and requested a warrant for Beresford–Redman's arrest. (*Id.*, ¶ 9). Also on November 12, 2010, the Court issued a warrant for the provisional arrest of Beresford–Redman.

On November 16, 2010, Beresford–Redman was arrested and taken into the custody. On November 17, 2010, the United States filed a Motion for Detention of Fugitive Bruce Ainsley Beresford–Redman Pending Extradition (the "Motion"). In the Motion, the United States asks this Court to order Beresford–Redman held without bond pending receipt of the formal request for extradition and the hearing on the certification of the extradition. (Mo-

tion at 1–2). On November 24, 2010, Beresford–Redman filed an "Ex Parte Application For Bail" and a memorandum in support of that Application ("Bail Memo.").[1] On November 29, 2010, the United States filed a Reply Brief ("Reply Brief"). On November 29, 2010, the Court held a hearing on the Motion. For the reasons discussed below, the Court GRANTS the United States's Motion for Detention (Docket No. 6) and orders that Beresford–Redman be held WITHOUT BAIL.

## II.

### ALLEGATIONS OF THE COMPLAINT[2]

Beresford–Redman was married to Monica Burgos Beresford–Redman ("Monica Burgos"), who was killed by asphyxiation on April 5, 2010 at the Hotel Moon Palace Nizuc in Cancun, Quintana Roo, Mexico. (Complaint at 2, ¶ 6(a)).

According to a sworn statement made to Mexican authorities by Monica Burgos' sister, Jeane Ferreira Burgos ("Ferreira Burgos"), approximately a month and a half before Monica Burgos was killed, Monica Burgos told Ferreira Burgos that Beresford–Redman was having an affair with another woman. (Complaint at 2–3, ¶ 6(b)). Monica Burgos confronted Beresford–Redman about his infidelity, which he acknowledged and asked for her forgiveness. (*Id.* at 3, ¶ 6(b)). Monica Burgos then withdrew assets from their joint bank account and moved them to a new account. (*Id.*). When Monica Burgos discovered that Beresford–Redman still had contact with his mistress, she demanded a divorce and told Beresford–Redman that if he agreed to the divorce, she would give him

half the money she had transferred to the new account. (*Id.*). Monica Burgos further told Beresford–Redman that if he did not agree to the divorce, she would keep all the money. (*Id.*).

According to a statement made by Ferreira Burgos to United States law enforcement authorities, prior to Beresford–Redman's and Monica Burgos' trip to Mexico, Monica Burgos had changed the locks on their residence in Palos Verdes and told Beresford–Redman to stay away. (Complaint at 3, ¶ 6(c)). Monica Burgos further notified the schools their children attended that Beresford–Redman should not be allowed to pick the children up from school. (*Id.*). In the weeks before the trip to Cancun, Monica Burgos took the children on a trip to Hawaii and refused to allow Beresford–Redman to accompany them. (*Id.*).

The fact of Beresford–Redman's affair was confirmed through emails obtained by the Mexican authorities in which Beresford–Redman admitted to his wife that he had been unfaithful. (Complaint at 3, ¶ 6(d)).

In a sworn statement to Mexican authorities, Ferreira Burgos said that she learned from Monica Burgos that Beresford–Redman had proposed a family trip to Mexico at the end of March 2010 and Monica Burgos accepted. (Complaint at 3, ¶ 6(e)). Monica Burgos told Ferreira Burgos that Beresford–Redman paid for the travel. (*Id.*).

United States law enforcement interviewed Maria Beatriz Oaxaca ("Oaxaca"), the nanny for Monica Burgos' two small children (ages 3 and 5), who stated that Beresford–Redman and Monica Burgos

---

1. On November 29, 2010, the Court granted Beresford–Redman's ex parte application to file the Bail Memo. and accompanying exhibits under seal based upon concerns for the privacy of Beresford–Redman's children as

well as for the friends and family who submitted letters on his behalf.

2. The Court sets out the facts as alleged in the Complaint.

had a big fight the night before they departed for Cancun. (Complaint at 4, ¶ 6(f)). Oaxaca stated that the fight concerned the affair that Beresford–Redman was having. (*Id.*). Oaxaca also stated that a day or two before the trip, she learned that Beresford–Redman wanted to buy life insurance for Monica Burgos and himself. (*Id.*). Oaxaca does not know if Beresford–Redman actually purchased the insurance. (*Id.*).

Beresford–Redman, Monica Burgos, and their two small children traveled to Cancun, arriving on March 31, 2010. (Complaint at 4, ¶ 6(g)). They all shared room number 7816 at the Hotel Moon Palace. (*Id.*).

In a conversation from Cancun on April 4, 2010, Monica Burgos told her sister, Ferreira Burgos, that she had found evidence that Beresford–Redman was still in contact with the woman with whom he was having the affair. (Complaint at 4, ¶ 6(h)).

Erick Uriel Gonzalez Reyes ("Gonzalez Reyes"), an employee at the Hotel Moon Palace, provided a sworn statement to Mexican authorities. (Complaint at 4, ¶ 6(i)). Gonzalez Reyes stated that around 8:30 p.m. on April 4, 2010, he saw a man and a woman arguing in front of the Los Tacos restaurant at the hotel. (*Id.*). Gonzalez Reyes observed the interaction of the two people for several minutes and noticed that the woman was crying. (*Id.*). Gonzalez Reyes said that as he continued to watch the argument, he saw the man twice attempt to physically assault the woman, but the man stopped when he realized that Gonzalez Reyes was watching. (*Id.*). Gonzalez Reyes later identified a photograph of Monica Burgos as the woman he saw outside the restaurant and said that a photograph of Beresford–Redman looked like the man who was arguing with her the evening of April 4, 2010. (*Id.* at 4–5, ¶ 6(i)).

According to a handwritten statement provided to hotel security officers, around 6:00 a.m. the next morning (April 5, 2010), two English teenagers from the Cook family who were staying at the hotel were awakened by "screams, crying for help and extremely loud banging from the room above [theirs]. . . . It sounded like a wom[a]n in extreme distress." (Complaint at 5, ¶ 6(j)). When the noises continued for about fifteen minutes, the teenagers went to their parents' room to tell them what they had heard. (*Id.*).

Hotel concierge Angelica Arroyo Ramirez ("Arroyo Ramirez") provided a sworn statement to Mexican authorities and said that on April 5, 2010, around 8:30 a.m., the Cook family approached Arroyo Ramirez and asked to file a complaint about the noise they had heard earlier that morning. (Complaint at 5, ¶ 6(k)). Arroyo Ramirez determined that Beresford–Redman, Monica Burgos, and their two small children were staying in the room from which the screams, crying and banging had come, which was located directly above the room occupied by the Cook teenagers. (*Id.*). The Cook family stated that the noises the teenagers had heard sounded like a woman crying and things being dragged across the floor. (*Id.*).

The morning of April 5, 2010, Arroyo Ramirez telephoned Beresford–Redman's hotel room to make sure that everyone was all right. (Complaint at 5, ¶ 6(*l*)). Beresford–Redman answered the phone and, when asked about the disturbance, replied that it was true that noises had come from his room and said that they were related to a fight he was having with his wife regarding the behavior of their children. (*Id.*). Beresford-Redman stated to Arroyo Ramirez that it would not happen again. (*Id.* at 5–6, ¶ 6(*l*)). Arroyo Ramirez did not speak to Monica Burgos. (*Id.* at 6, ¶ 6(*l*)).

In a subsequent statement given to Mexican authorities after his wife disappeared, Beresford–Redman denied making the statement to Arroyo Ramirez regarding having an argument with his wife and instead claimed that the noise was caused by a game that he and his wife were playing with their three year-old son which involved colliding with the bed or the wall. (Complaint at 6, ¶ 6(m)). Beresford–Redman stated that it was his son who was making the most noise. (*Id.*).

Carlos Mario Vasquez Olan ("Vasquez Olan"), a cleaning employee of the hotel, made a sworn statement in which he told Mexican authorities that he was assigned to clean rooms including number 7816, which was occupied by Beresford–Redman. (Complaint at 6, ¶ 6(n)). On April 3, 2010, Vasquez Olan cleaned room 7816 and did not notice anything out of the ordinary. (*Id.*). On April 5, 2010, Vasquez Olan arrived to clean room 7816 and noticed the "Do Not Disturb" sign hanging on the door all morning. (*Id.*). When he returned around 3:00 p.m., the "Do Not Disturb" sign was still on the door. (*Id.*). At one point that afternoon, Vasquez Olan encountered Beresford–Redman coming out of room 7816. (*Id.*). When Vasquez Olan asked if Beresford–Redman wanted his room cleaned or new towels, Beresford–Redman declined and said that everything was fine. (*Id.*). Vasquez Olan stated that the "Do Not Disturb" sign was still on the door to room 7816 at 5:00 p.m. that evening. (*Id.*). Vasquez Olan did not enter room 7816 that day. (*Id.*).

According to an April 7, 2010 sworn statement made to Mexican authorities, Beresford–Redman said that the last time he saw his wife was on April 5, 2010, at approximately 8:30 or 9:00 a.m. in their room. (Complaint at 6, ¶ 6(o)). He said that she left to go shopping and he did not expect her to return until around 10:00 p.m. that night. (*Id.* at 6–7, ¶ 6(o)).

Beresford–Redman also said that his wife left the hotel for the day and did not take her cell phone with her. (*Id.* at 7, ¶ 6(o)). In an April 12, 2010 interview with United States law enforcement, Ferreira Burgos stated that Monica Burgos never traveled anywhere without her cell phone and certainly would not have left her cell phone at the hotel if she was traveling without her children. (*Id.*).

In his sworn statement, Beresford–Redman said that his wife did not return in the evening of April 5, 2010 and that, around 10:00 p.m., he went to bed. (Complaint at 7, ¶ 6(p)). He further stated that around 11:00 p.m., he awoke to find that she still had not returned. (*Id.*). Beresford–Redman claimed that this worried him, and so he walked around the hotel to look for her. (*Id.*). He said he went in and out of the room several times but never spoke to anyone at the hotel or reported his wife missing that night. (*Id.*). Beresford–Redman said he then returned to his room and eventually fell back asleep. (*Id.*). This statement conflicted with a telephone call that Beresford–Redman had with Ferreira Burgos. (*Id.*). In her sworn statement to Mexican authorities, Ferreira Burgos said that she spoke with Beresford–Redman by telephone on April 6, 2010, at which time Beresford–Redman told her he had fallen asleep on the night of April 5, 2010, and did not notice his wife's absence until he woke up the next morning. (*Id.*).

At about 7:00 a.m. on Tuesday, April 6, 2010, Beresford–Redman told hotel employees that his wife was missing. (Complaint at 7, ¶ 6(q)). He was told that he should report that information to the local prosecutor, but instead he went to the U.S. Consulate. (*Id.*). At the Consulate, he was again told to report his wife's disappearance to the local prosecutor, which he did at around 5:45 p.m. on April 6, 2010. (*Id.* at 7–8, ¶ 6(q)).

Hotel security guard Rodolfo Mogo Almeida ("Mogo Almeida") was interviewed by Mexican authorities and provided a sworn statement that the hotel keeps very detailed records of persons entering and exiting the hotel property, including checking names against a list of hotel guests, and that every hotel guest leaving the property is identified. (Complaint at 8, ¶ 6(r)). Mogo Almeida's shift is from 8:00 a.m. to 5:00 p.m., Monday through Saturday. (*Id.*). He stated that he had not seen Monica Burgos until being shown a video of her as the search party was organized. (*Id.*).

After the hotel created a search team to look for Monica Burgos, her body was found by a hotel employee on April 8, 2010, at approximately 9:20 a.m., in a sewage tank on the hotel grounds. (Complaint at 8, ¶ 6(s)). The tank was approximately 25 meters from the building where Beresford–Redman's hotel room was located. (*Id.*). The tank had an opening at the top and one of the two covers was not properly closed. (*Id.*).

An autopsy revealed that the cause of Monica Burgos' death was asphyxia by suffocation. (Complaint at 8, ¶ 6(t)). The autopsy report also reported the presence of bruising to the victim's face and a blunt head wound that the examiner stated was related to the time and date of death. (*Id.*).

On April 9, 2010, a forensic expert examined Beresford–Redman's hotel room. (Complaint at 8, ¶ 6(u)). He found stains on a pillar in the room, on the sheets on the bed, and on a railing on the balcony of the room. (*Id.*). The stains tested presumptively positive for the presence of blood. (*Id.*).

The hotel room in which Beresford–Redman and his family were staying has a view of the sewage tank in which the victim's body was found. (Complaint at 9, ¶ 6(v)). There was a footprint and damaged plants leading to the sewage tank, indicating that the body may have been moved from another location and deposited there. (*Id.*).

The hotel room in which Beresford–Redman and his family were staying has a door which is opened by an electronic card key. (Complaint at 9, ¶ 6(w)). Records from the hotel indicate that one of the keys issued to Beresford–Redman and his family was used to open the door to their room, number 7816, at least nine times between midnight and 7:00 a.m., in the early morning hours of April 6, 2010. (*Id.*). At least four of these entries are recorded as occurring during a fifteen-minute period between 4:00 a.m. and 4:15 a.m. (*Id.*).

A purse was found with Monica Burgos' body in the sewage tank. (Complaint at 9, ¶ 6(x)). The contents of the purse included identification documents for Monica Burgos and other personal items. (*Id.*). The purse did not contain a hotel key card. (*Id.*).

During the April 7, 2010 interview of Beresford–Redman conducted by Mexican authorities after the disappearance of his wife, law enforcement officers observed scratches or abrasions on both of Beresford–Redman's hands, behind his ear, on his left shin, and on his right ankle. (Complaint at 9, ¶ 6(y)). Beresford–Redman said the scratches on his hands and legs came from climbing a slippery wall during an excursion earlier on the trip. (*Id.*). He stated that the scratches behind his ear were caused when he surfaced too quickly while swimming and hit a rope connected to the boat. (*Id.*).

Beresford–Redman's colleague, Tim Blixseth ("Blixseth"), gave a statement to United States law enforcement following the murder of Monica Burgos. (Complaint at 9–10, ¶ 6(z)). Blixseth stated that he had not heard from Beresford–Redman in a year when he received an e-mail from

Beresford–Redman on April 7, 2010, indicating that Beresford–Redman's wife was missing. (*Id.*). Blixseth asked Beresford–Redman to call him. (*Id.* at 10, ¶ 6(z)). That evening, Beresford–Redman called Blixseth at approximately 6:30 p.m. and said, "I lost my wife." (*Id.*). Blixseth stated that it was as if Beresford–Redman was reading from a script. (*Id.*). There was no emotion. (*Id.*). Beresford–Redman and Blixseth spoke again and Beresford–Redman said that Monica Burgos had left to go shopping on April 5, 2010, but there was no record of Monica Burgos ever leaving the resort even though each guest was checked in and out of the resort by hotel employees. (*Id.*). Blixseth stated that Beresford–Redman was very calm and it was as if he had just lost his dog. (*Id.*). On May 29, 2010, Mexican authorities issued a warrant for Beresford–Redman's arrest. (Motion at 1).

## III.

## BERESFORD–REDMAN'S ALLEGATIONS AND EVIDENCE

Beresford–Redman contends that this Court should grant him bail because he is not a flight risk nor is he a danger to the community. (Bail Memo. at 2). Further, Beresford–Redman contends that special circumstances exist that would support a grant of bail. (*Id.*). At the hearing on the Motion, Beresford–Redman argued that the weakness of the evidentiary support for the provisional arrest warrant was another special circumstance in favor of bail.

### A. Evidence In Support Of The Contention That Beresford–Redman Is Not A Flight Risk Or Danger To Community

Beresford–Redman offers considerable evidence in support of his contention that he is neither a flight risk nor a danger to the community. For example, he is a

United States citizen and has resided in the Los Angeles area for more than ten years. (Bail Memo. at 3). Since the death of his wife in April, he has openly resided in his family home with his two children and parents. (*Id.* at 4).

Beresford–Redman alerted Mexican authorities to his wife's disappearance and cooperated with Mexican police in their efforts to locate her and investigate her murder. (*Id.*).

Beresford–Redman contends that his return to Los Angeles did not violate Mexican law. He did not offer false identification or a false passport to reenter the United States. Instead, he openly crossed the border using his California driver's license. (*Id.* at 5). Beresford–Redman contends that because he had not been named as a suspect nor were any formal proceedings initiated against him at the time of his departure, his return to the United States was not an improper effort to flee from justice. (*Id.* at 4–5).

Beresford–Redman offers the declaration of Julio Antonio Hernandez Pliego in support of these contentions. Mr. Pliego offered his expert opinion that, under Mexican law, there was no legal impediment barring Beresford–Redman from leaving the jurisdiction of the State of Quintana Roo when he did. (*Id.* at 4; *see also* Declaration of Julio Antonio Hernandez Pliego ("Pliego Dec."), at ¶ 4).

Beresford–Redman notes that upon learning that the Mexican authorities had issued an arrest warrant for him, his counsel contacted Assistant United States Attorney Daniel Goodman and offered to voluntarily surrender should a warrant in connection with extradition be issued for his arrest. (Bail Memo. at 5–6; *see also id.* Exh. B, June 1, 2010 letter). Beresford–Redman contends that many months have passed since he became aware that he would be charged in Mexico for the

murder of his wife, yet he has made no attempt to leave Los Angeles. (Bail Memo. at 6). Finally, he points to his retention of counsel both in Mexico and Los Angeles as evidence of his intent to fight the charges against him, rather than flee. (*Id.*).

In further support of his contention that he is neither a flight risk nor a danger to the community, Beresford–Redman offers letters from friends and family. These letters are from individuals who have known Beresford–Redman personally and professionally for many years. The letters consistently aver that Beresford–Redman is an individual of fine character, *i.e.*, that he is honest, reliable and trustworthy. (*See* Bail Memo. Exh. C, *passim*). Beresford–Redman notes that he has no prior criminal record nor any history of violent conduct. (Bail Memo. at 8). Based on these facts, and because his friends and family describe him as a person who is characterized by "kindness" and "commitment to family," Beresford–Redman submits that he is neither a flight risk nor a danger to the community. (*Id.*).

### B. Evidence In Support Of The Contention That Special Circumstances Exist In Favor Of Granting Bail

Beresford–Redman acknowledges that a detainee is generally required to demonstrate "special circumstances" to justify bail in an extradition proceeding. (Bail Memo. at 8). Beresford–Redman includes two arguments in his memorandum in favor of a finding of special circumstances: (1) that in light of his wife's recent death and his children's young age, his children need him at home during this time and (2) Beresford–Redman's character and family support are a special circumstance.

#### i. The Children's Need For A Parent

According to Beresford–Redman, "long and protracted" proceedings in family law court concerning the guardianship and well-being of the Beresford–Redman children were initiated soon after the death of their mother. (Bail Memo. at 9). In addition, the two children have been "in therapy" since April 2010 to assist them in coping with the death of their mother. (*Id.*).

According to Beresford–Redman's family law attorney, Adrienne R. Hahn:

> The children are in need of their father as they cope with the loss of their mother and the permanent guardians assert losing another parent at this time is not in their best interests.

(Declaration of Adrienne R. Hahn ("Hahn Dec.") at ¶ 3).

Furthermore, Ms. Hahn states that Judge Mitchell L. Beckloff, who is "assisting the parties to resolve guardianship issues," found that "Bruce Beresford–Redman's presence in the home as extremely important for the children. The court stressed that the children needed the consistency of having their father with them everyday as part of coping with their grief." (Hahn Dec. at ¶ 3).

Beresford–Redman also offers the declaration of the children's therapist, Cathleen Carlson. Ms. Carlson offered her professional opinion that incarcerating Beresford–Redman while awaiting possible extradition would cause damage to his children. (Declaration of Cathleen Carlson ("Carlson Dec.") at ¶¶ 2, 4).[3]

#### ii. Beresford–Redman's Evidence Regarding Character And Family Support

Beresford–Redman asserts that a person's character and background may also

---

**3.** As noted above, certain documents were filed under seal. The Court has omitted mention of any portion of the documents which would compromise the privacy concerns of either the Beresford–Redman children or Beresford–Redman's friends and relatives.

constitute a special circumstance, as well as the "dedication of friends and family." (Bail Memo. at 12). Beresford–Redman offers multiple letters, as discussed in the likelihood of flight section above, that describe Beresford–Redman's "outstanding character" and love of his family. (Bail Memo. at 13). In addition, Beresford–Redman's parents, David and Juanita Beresford–Redman, offered to be sureties for a bond in the amount of $500,000, to be secured by the assets in the retirement account of David and Juanita Beresford–Redman. (*Id.*).

## IV.

## STANDARD FOR BAIL IN EXTRADITION PROCEEDINGS

■ "Over ninety years ago, the Supreme Court recognized that there is a presumption against bail in an extradition cases and only 'special circumstances' will justify bail." *In re Extradition of Kirby*, 106 F.3d 855, 858 (9th Cir.1996) (quoting *Wright v. Henkel*, 190 U.S. 40, 63, 23 S.Ct. 781, 47 L.Ed. 948 (1903)); *accord Salerno v. United States*, 878 F.2d 317, 317 (9th Cir.1989). This presumption "exists due to the foreign relations interest of the United States in successfully returning persons subject to criminal prosecution to the requesting country." *In re Extradition of Nacif–Borge*, 829 F.Supp. 1210, 1214 (D.Nev.1993). "The party seeking release on bail has the burden of showing that special circumstances exist." *In re Extradition of Santos*, 473 F.Supp.2d 1030, 1035 (C.D.Cal.2006); *accord In re Extradition of Morales*, 906 F.Supp. 1368, 1373 (S.D.Cal.1995). Because an extradition proceeding is not a criminal case, the Bail Reform Act of 1984 does not govern, nor is its presumption in favor of bail a part of extradition proceedings. *Kamrin v. United States*, 725 F.2d 1225, 1227–28 (9th Cir.1984).

■ "The term 'special circumstances' has never been precisely defined and courts have addressed on a case by case basis particularly sufficient circumstances that would reverse the strong presumption against bail." *In re Extradition of Maniero*, 950 F.Supp. 290, 294 (S.D.Cal.1996); *accord In re Extradition of Kirby*, 106 F.3d at 863 ("*Wright v. Henkel* does not provide significant guidance as to what 'circumstances' might be considered 'special.'"). The Ninth Circuit has provided the following three examples of "special circumstances": (1) "the raising of substantial claims upon which the [defendant] has a high probability of success"; (2) "a serious deterioration of health while incarcerated"; and (3) "unusual delay in the appeal process." *Salerno*, 878 F.2d at 317. However, this list is not exhaustive and "the determination of what constitutes a 'special circumstance[']' is left to the sound discretion of the trial judge." *In re Extradition of Santos*, 473 F.Supp.2d at 1036 (internal quotation marks omitted). The Ninth Circuit has explained that issues common to all incarcerated defendants do not qualify as "special circumstances." *In re Extradition of Smyth*, 976 F.2d 1535, 1535–36 (9th Cir.1992) ("The need to consult with counsel, gather evidence and confer with witnesses, although important, is not extraordinary; all incarcerated defendants need to do these things."). Determining whether certain facts qualify as a "special circumstance" requires "a cautious judgment by the judge, taking into account the totality of the facts and having a healthy respect for this country's international treaty agreements." *In the Matter of the Extradition of Molnar*, 182 F.Supp.2d 684, 688 (N.D.Ill.2002).

■ Even if a defendant can show "special circumstances" justifying bail, he "also must demonstrate that there is no risk he will fail to appear for further extradition

proceedings and that he is not a danger to the community." *In re Extradition of Santos,* 473 F.Supp.2d at 1035; *accord In re Extradition of Morales,* 906 F.Supp. at 1373; *see also In re Extradition of Chapman,* 459 F.Supp.2d 1024, 1027 (D.Haw. 2006) ("While lack of flight risk is not the criteria for release in an extradition case, several courts have found it to be an important factor in granting bail." (internal quotation marks, citation, and emphasis omitted)); *United States v. Taitz,* 130 F.R.D. 442, 444 (S.D.Cal.1990) ("[S]pecial circumstances must exist in addition to absence of risk of flight.").

## V.

### DISCUSSION

■ The standard by which a defendant must demonstrate "special circumstances" is not entirely clear. Many courts have required clear and convincing evidence.[4] *See, e.g., United States v. Ramnath,* 533 F.Supp.2d 662, 671 (E.D.Tex.2008); *In re Extradition of Gonzalez,* 52 F.Supp.2d 725, 735 (W.D.La.1999); *In re Extradition of Maniero,* 950 F.Supp. at 294–95; *In re Extradition of Nacif–Borge,* 829 F.Supp. at 1214–15; *In re Extradition of Patel,* 2008 WL 896069 at *1 (D.Or. Mar. 29, 2008). Other cases have required only a preponderance of the evidence. *See, e.g., In re Extradition of Santos,* 473 F.Supp.2d at 1036 n. 4 (C.D.Cal.2006); *Garcia v. Benov,* 2009 WL 6498194 at *3 (C.D.Cal. Apr. 13, 2009). It is unnecessary for this Court to resolve the disagreement over the standard of proof, because even assuming *arguendo* that the standard is preponderance of the evidence, Beresford–Redman has failed to satisfy this standard.

### A. The Beresford–Redman Children's Need For Their Father Does Not Qualify As A Special Circumstance

■ Beresford–Redman argues that his young children's need for a parent to be with them to cope with the loss of their mother is a "special circumstance" warranting bail. (Bail Memo. at 9–11). Beresford–Redman offers the declaration of Adrienne R. Hahn, attorney for David and Juanita Beresford–Redman in the guardianship action, in support of this assertion, as well as the declaration of Cathleen Carlson, the children's therapist. These declarations describe the damage that the declarants believe the children will suffer should Beresford–Redman be denied bail.

■ The United States argues that the deprivation of a parent's love and support, when that parent has been charged with a crime, is not a unique and "special" circumstance, but rather a consequence of every criminal defendant's arrest. (Reply at 2–3). This Court agrees. Emotional hardship for the family of a fugitive facing extradition is "present in almost all cases and therefore [does] not constitute a 'special circumstance.'" *Matter of Extradition of Russell,* 805 F.2d 1215, 1217 (5th Cir.1986); *United States v. Mahabir,* 858 F.Supp. 504, 508 (D.Md.1994) ("A defendant's incarceration regularly creates difficulties for him and his family."); *see also Extradition of Smyth,* 976 F.2d at 1535–36 (special circumstances must be "extraordinary" and not factors applicable to all fugitives facing extradition).

While the Court recognizes that the age of these children and the recent loss of their mother renders them particularly

---

**4.** "Clear and convincing evidence is evidence that produces ... a firm belief or conviction as to the matter at issue. This involves a greater degree of persuasion than is necessary to meet the preponderance of the evidence standard." *Ramnath,* 533 F.Supp.2d at 665 n. 4 (internal citations and quotations omitted).

vulnerable, these two factors alone are not enough to convert the emotional hardship they will suffer from the detention of their father into a special circumstance. The Court notes that guardianship was recently awarded to David and Juanita Beresford–Redman, the children's grandparents, who have a close relationship with the Beresford–Redman children. The children appear to have a loving and supportive family beyond their father and will be well cared for during his absence. Finally, to the extent that the allegations of the provisional arrest complaint indicate that Beresford–Redman's conduct was the cause of his children's suffering, he should not receive the benefit of bail as a result of his own wrongdoing. Accordingly, this Court rejects this ground as a special circumstance favoring bail.

### B. Beresford–Redman's Character Evidence Does Not Qualify As A Special Circumstance In Favor Of Bail

■ Beresford–Redman offered multiple letters from friends, family and business associates in support of his contention that his character, integrity and commitment to his family are a special circumstance that favor bail. The Court finds that while this evidence may be relevant to the assessment of flight risk and danger (although not dispositive on either issue), the *totality* of the evidence proffered here does not qualify as a "special circumstance" in favor of bail.

As noted in *Nacif–Borge,* "[m]ore often, the character and background of a person subject to extradition are considered in regard to risk of flight and danger to the community rather than as a special circumstance." *Nacif–Borge,* 829 F.Supp. at 1220; *Matter of Extradition of Sutton,* 898 F.Supp. 691 (E.D.Mo.1995) ("an extradition fugitive's character and background ... are not by themselves a special circumstance."). To the extent the letters of support make some showing that Beresford–Redman is trustworthy, the Court nevertheless finds that this does not establish a special circumstance in the present case, but instead is relevant to the question of whether or not he will flee.

Moreover, the Court finds that these letters, when considered in light of the specific and detailed allegations of the Complaint, at best create a seriously disputed issue regarding Beresford–Redman's character and do not prove good character or trustworthiness by a preponderance of the evidence. The Complaint alleges that Beresford–Redman was engaged in a lengthy extra-marital affair and that the existence of the affair is confirmed both in email evidence and witness statements. (Complaint at ¶ 6(b), (d), (f), (h)). None of the letters of support acknowledge this affair or explain how this conduct is consistent with a man of "integrity" or one who is "devoted" to his family.

Furthermore, the Complaint summarizes an employee's statement that describes the employee witnessing Beresford–Redman's attempt to physically assault Monica Burgos at the Cancun hotel. (Complaint at 6(i)). The Complaint also details a complaint to the hotel by the occupants of the room (a family) directly below the Beresford–Redman room. The family describes hearing screaming, cries for help, and loud banging in the room above them during the early morning hours of April 5, 2010. (*Id.* at 6(j) and (k)). Beresford–Redman later provided a statement that the last time he saw his wife was on April 5, 2010, when she left their room to go shopping at 8:30 or 9:00 a.m. (*Id.* at 6(o )). Monica Burgos' body was discovered by a hotel employee on April 8, 2010, in a sewage tank on the hotel grounds, approximately 25 meters from Beresford–

Redman's hotel room. (*Id.* at 6(s)). Subsequently, blood stains were found in Beresford–Redman's hotel room on a pillar, on the sheets on the bed and on a railing on the balcony. (Complaint at 6(u)).

Again, none of the letters of support mention the facts described above. Although counsel argued that friends and family were aware of the allegations in the Mexican arrest warrant, issued prior to the drafting of these letters, there is no evidence before this Court that the authors of these letters were aware of the specific factual allegations contained in the November 12, 2010 Complaint. Accordingly, the Court finds that Beresford–Redman's evidence regarding his character and trustworthiness does not show, by a preponderance of the evidence, that his character qualifies as a special circumstance justifying bail.

### C. Beresford–Redman's Fourth Amendment Challenge To The Provisional Arrest Warrant Does Not Establish A Special Circumstance In Favor Of Bail

On November 29, 2010, Beresford–Redman filed a document entitled "Motion to Release Bruce Beresford–Redman For Provisional Arrest In Violation Of The Fourth Amendment, Or In The Alternative As Further Special Circumstances Supporting The Granting Of Bail" (the "Motion to Release"). In that Motion to Release, Beresford–Redman argues that the United States's lack of probable cause should be considered a "special circumstance" favoring bail. (Motion to Release at 3). Beresford–Redman contends that the showing of probable cause in the provisional arrest warrant was defective because the allegations were made by an Assistant United States Attorney on "nothing more than information and belief." (*Id.* at 5). Although Beresford–Redman neglected to mention this argument in his opposition to the Motion for Detention, and only raised it for the first time in the Motion to Release, the Court permitted counsel to discuss this argument at the November 29, 2010 hearing.

At the hearing, Beresford–Redman's counsel asserted that the reasoning of *In re Extradition of Molnar, supra,* supports a finding that the provisional arrest of Beresford–Redman should constitute a special circumstance. In *Molnar,* the defendant, Sandor Molnar ("Molnar"), was taken into custody following a provisional arrest request by the Republic of Hungary. 182 F.Supp.2d at 687. Apparently, while drunk, Molnar pointed a gun at police. *Id.* at 686. The Hungarian authorities concluded that criminal action was not appropriate and Molnar left Hungary for the United States. *Id.* At some later date, criminal charges were brought against Molnar in Hungary. *Id.* However, more than three years had passed from the date of the original conduct when Molnar was arrested. *Id.*

The *Molnar* court noted that "[t]he courts have not viewed a provisional arrest, in and of itself, a 'special circumstance.' ... It [a provisional arrest] certainly does not eliminate the 'special circumstances' rule." *In re Extradition of Molnar,* 182 F.Supp.2d at 687 (internal citations omitted). The *Molnar* court continued by observing that even the government conceded that Molnar himself was not a flight risk and that there was no urgency to his apprehension and incarceration. *Id.* at 688. Furthermore, Molnar offered multiple grounds in favor of a special circumstances finding, including his ill mother's need for his financial assistance, the fact that he was not a fugitive from justice, the possible delay in his extradition proceedings, and, most importantly, that the criminal charges against him were once dropped and were

arguably weak. *Id.* at 689. Finding that the provisional arrest setting allowed for a more liberal approach to bail, the court viewed Molnar's circumstances collectively and found that he had established special circumstances. *Id.*

Beresford–Redman's contention that the *Molnar* decision somehow stands for the proposition that the provisional arrest warrant here should suffice as a "special circumstance" misreads that decision. Molnar's factual contentions in support of a special circumstances finding, when considered collectively, were far more compelling than those asserted by Beresford–Redman. Beresford–Redman, charged with the murder of his wife, is accused of a significantly more serious and violent crime than Molnar. The detailed factual allegations in the Complaint, if true and unrebutted, do not suggest a weak case against Beresford–Redman. The Mexican authorities issued an arrest warrant for Beresford–Redman in May 2010, shortly after the April death of his wife, in contrast to the more than three-year delay of the Hungarian authorities in pursuing Molnar. Unlike the *Molnar* case, the Mexican authorities have not "dropped" the charges against Beresford–Redman, but are actively pursuing these charges.[5] In sum, the *Molnar* decision does not compel the award of bail here. The Court rejects Beresford–Redman's contention that the provisional arrest complaint or the quality of the evidence underlying that complaint should qualify as a special circumstance in favor of bail.

#### D. Beresford–Redman Is A Flight Risk

 Beresford–Redman, who lacks any criminal history or any prior history of violence, does not present a danger to the community. The facts concerning risk of flight, however, do not necessarily favor Beresford–Redman.

As noted above, the evidence regarding Beresford–Redman's character and trustworthiness is disputed. Although friends and family aver that he could be trusted to remain in the United States, the Complaint alleges that Beresford–Redman was unfaithful to his wife, a fact which suggests a lack of trustworthiness. Although Beresford–Redman could return to Mexico and voluntarily surrender, he has not done so. He is a well-educated and sophisticated individual, facing serious charges in a foreign country. The Court finds that Beresford–Redman has both incentive and ability to flee. Accordingly, the Court finds that Beresford–Redman presents a risk of flight.

### VI.

### CONCLUSION

IT IS ORDERED that: (1) the United States's Motion for Detention (Docket No. 6) is GRANTED; and (2) Beresford–Redman shall be held WITHOUT BAIL.

IT IS FURTHER ORDERED that the Clerk of the Court serve copies of this Order on counsel for both parties.

---

**5.** The Court notes that the ultimate request for extradition in *Molnar* was eventually denied for a lack of probable cause. *See In the* *Matter of the Extradition of Molnar,* 202 F.Supp.2d 782, 787 (N.D.Ill.2002).