**In the Matter of the EXTRADITION OF LUI Kin–Hong, a/k/a Jerry Lui.**

**M.B.D. No. 95–M1072–ZRK.**

United States District Court,
D. Massachusetts.

Feb. 2, 1996.

Andrew Good, Silverglate & Good, Boston, MA, for Defendant.

Susan C. Hanson–Philbrick, United States Attorney's Office, Boston, MA, for U.S.

### ORDER REGARDING DETENTION

KAROL, United States Magistrate Judge.

In a complaint filed in this court on December 19, 1995, pursuant to 18 U.S.C. 3184 (1994), Assistant United States Attorney Susan Hanson–Philbrick, on behalf of United States Attorney Donald K. Stern, stated under oath that she had been advised that the Crown Colony of Hong Kong had issued a warrant for the arrest of Lui Kin-hong, a/k/a Jerry Lui ("Lui"), for allegedly violating Section 9(1)(a) of Hong Kong's Prevention of Bribery Ordinance, Cap. 201. She further stated that Lui was expected to arrive at Logan Airport in East Boston on December 20, 1995, and that the Government of the United Kingdom, on instructions from the Crown Colony of Hong Kong, had requested that Lui be provisionally arrested for the purpose of extraditing him to Hong Kong. On the basis of these allegations, the government sought a warrant for Lui's arrest.

The court issued the warrant, and Lui was arrested at Logan Airport on December 20. He was brought before the court for an initial appearance on December 21, 1995, at which time the government moved that Lui be detained pending the completion of extradition proceedings pursuant to the extradition treaty in force between the United States and the United Kingdom. *See* Extradition Treaty Between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland, June 8, 1972, 28 U.S.T. 227, made applicable to Hong Kong by an exchange of notes in Washington, D.C. on October 21, 1976, and Supplementary Treaty Concerning the Extradition Treaty Between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland, Signed at London on 8 June 1972, June 25, 1985, S. Treaty Doc. No. 99–8, 99th Cong., 1st Sess. (entered into force Dec. 23, 1986), all *reprinted in* 2 *Extradition Laws and Treaties, United States* 920.1 to 920.30 (compiled by Igor I. Kavass & Adolf Sprudzs, 1980 & Rev. 6 1989). The court ordered that Lui be temporarily detained pending a full hearing on the government's motion. Subsequently, Lui filed a cross motion to be released on conditions. Following a series of continuances that Lui requested, the court held a hearing on both motions on January 10, 1996. At the conclusion of the hearing, the parties requested and were granted leave to file supplemental memoranda and affidavits on or before January 17, 1996. Supplemental filings were timely made. Upon consideration of the evidence submitted at the hearing and the voluminous submissions and supplemental submissions of the parties, and for the reasons stated below, the government's motion to detain Lui is

hereby ALLOWED, and Lui's cross motion to be released on conditions is DENIED.

## I. BACKGROUND

It appears from the complaint, the evidence submitted at the detention hearing, and the supplemental filings that Hong Kong authorities allege that Lui was a senior executive of the British American Tobacco Co. (HK) Ltd. ("BAT") in Hong Kong. BAT apparently had exclusive rights to distribute several popular brands of cigarettes within certain Asian countries, and Lui had the important job of allocating to selected Hong Kong trading companies a share of the cigarettes that were available for export to those countries, including the People's Republic of China ("PRC"). Lui and other senior BAT officers, in violation of Hong Kong law, allegedly solicited and accepted bribes amounting to several million U.S. dollars from one such export company, Giant Island Ltd. ("GIL"), in exchange for granting to GIL a virtual monopoly over the export of certain brands of cigarettes to certain countries.

Hong Kong authorities apparently learned about the alleged bribes from a former GIL shareholder and employee, Chui To-yan ("Chui"), who began cooperating with investigators sometime after he left GIL's employ in April 1993. Beginning in March 1994, participants in the conspiracy allegedly sought to discourage and prevent Chui from continuing to cooperate with Hong Kong authorities in their investigation of the alleged illegal payments. On April 26, 1994, on the basis of information Chui had provided, investigators went to Lui's home in Hong Kong with the intention of arresting him. Lui was not present. The next day, Lui's attorney advised the investigators that Lui had left Hong Kong on a business trip on April 24 and would consent to be interviewed upon his return, which was then expected sometime in May. At the end of May 1994, Lui's attorney reported that Lui had still not returned to Hong Kong and, because of unexpected business developments, was not planning to return for an additional eight to ten weeks.

Lui apparently never returned to Hong Kong, or, if he did, he did so without making his presence known to authorities there. Instead, he and his family established permanent residence in the Philippines, a country with which Hong Kong has no extradition treaty and to which BAT had abruptly relocated its business operations. In June 1994, Lui and his wife, both of whom have family, property, and educational ties to Canada, became Canadian citizens. In a letter dated October 26, 1994, to Hong Kong investigators, Lui's attorney claimed that Lui and his company had been forced to relocate as the result of the adverse effect that the ongoing investigation in Hong Kong was having on Lui's business. The attorney further stated that Lui would be prepared to meet with the investigators in the Philippines. For reasons that have not been made clear, no such meeting was held.

On January 23, 1995, a Hong Kong magistrate issued an initial warrant for Lui's arrest. On or about March 29, 1995, Chui, who had moved to Singapore, was abducted, tortured, and murdered with extreme atrocity and cruelty. On December 12, 1995, another warrant for Lui's arrest, with expanded charges, was issued in Hong Kong. On December 19, 1995, Lui left Manila on a flight to Boston, with connecting layovers in Tokyo and Toronto. His stated purpose in coming to Boston was to visit a friend's child who had been seriously injured in an automobile accident. Hong Kong authorities learned of the trip and secured the cooperation of United States authorities, which resulted in Lui's arrest.

## II. DISCUSSION

### A. The Legal Standard

■■■ Courts have some discretion to grant bail in foreign extradition cases, but there is a presumption against doing so. *Beaulieu v. Hartigan,* 554 F.2d 1, 1–2 (1st Cir.1977). The reluctance of courts to grant pre-hearing release to persons sought by authorities with whom the United States has extradition treaties has been evident at least as early as the turn of the century, *see Wright v. Henkel,* 190 U.S. 40, 61–63, 23 S.Ct. 781, 786–87, 47 L.Ed. 948 (1903); *In re Mitchell,* 171 F. 289, 289–90 (S.D.N.Y.1909), and it has remained constant over the years.

It is based on the view that, subject to limited exceptions, the United States has a solemn obligation to honor the lawful requests of its treaty partners to deliver to them accused persons found within its jurisdiction. In recognition of this obligation and to assure that we as a nation will always be in a position to honor it, bail is not granted in foreign extradition cases unless "special circumstances" exist. *See Koskotas v. Roche,* 931 F.2d 169, 175 (1st Cir.1991) (quoting *United States v. Williams,* 611 F.2d 914 (1st Cir.1979)). This "special circumstances" standard is much stricter than the "reasonable assurance" of appearance standard made applicable to domestic criminal proceedings by the Bail Reform Act. *See* 18 U.S.C. § 3142(e) (1994). Under the "special circumstances" standard, it would not be enough for the accused to be a "tolerable bail risk," *United States v. Williams,* 611 F.2d 914, 915 (1st Cir.1979), although that is surely a necessary condition. Rather, there must also be some "pressing circumstances," such that "the requirements of justice are absolutely peremptory." *See id.* (citing *In re Mitchell,* 171 F. 289 (S.D.N.Y.1909)).

Examples of the type of circumstances that have been deemed to be sufficiently urgent to warrant the granting of bail in foreign extradition cases are few and far between. In *Mitchell,* the accused was released solely for the few days necessary for him to attend a pending civil case on whose outcome his "whole fortune" depended. *See* 171 F. at 289–90. In *Hu Yau–Leung v. Soscia,* 649 F.2d 914, 920 (2d Cir.), *cert. denied,* 454 U.S. 971, 102 S.Ct. 519, 70 L.Ed.2d 389 (1981), release on bail was warranted because the accused was a juvenile and there was no suitable facility in which he could be held. In dictum in *Williams,* the First Circuit cited *United States ex rel. McNamara v. Henkel,* 46 F.2d 84 (S.D.N.Y.1912), for the proposition that a special circumstance "may include a delayed extradition hearing." *See* 611 F.2d at 915. It should be noted, however, that the court in *McNamara* expressly rejected the suggestion that a person might ever be admitted to bail prior to the date set for a "reasonably early" extradition hearing. *See* 46 F.2d at 84. Only where the hearing date "comes and the complainant is not ready to

proceed" would it be "time . . . to ask for bail." *See id.* Conversely, mere unfairness, such as where two similarly situated persons are treated differently, is not a special circumstance. *See Williams,* 611 F.2d at 915. As these examples illustrate, bail must be denied unless the accused is not only a "tolerable bail risk," but also would suffer some extreme deprivation beyond the ordinary "discomfiture of jail" if not released pending the extradition hearing. *See id.*

### B. Application of the Legal Standard

#### 1. Risk of flight

██ Lui is clearly not a "tolerable bail risk." He has no apparent ties to the community, and he has not stated a need or desire to remain in or return to the United States. Thus, there is no apparent reason why it would be in his interest to see the extradition process through to its conclusion. Further, whether he is concerned about *prosecution* for bribery in this case, as the timing and suddenness of his departure from Hong Kong in April 1994 strongly suggest, or about political *persecution* after Hong Kong reverts to the PRC on July 1, 1997, as he claims (*see* Supplem. Mem. of Law of Lui Kin–Hong in Supp. of His Mot. for Release on Conditions (docket no. 20), at 8), Lui has a strong aversion to returning to Hong Kong. Moreover, after his sudden departure from Hong Kong in 1994, he relocated his primary residence, his family, and his business to the Philippines, a country with which Hong Kong has no extradition treaty and to which he would dearly like to return. In addition, Lui possesses considerable wealth, along with worldwide influence and connections, all of which would make the chance of a successful escape greater for him than for the ordinary fugitive. Under these circumstances, Lui poses a very serious risk of flight.

Without conceding any of the foregoing, Lui has proposed a private security arrangement that he says should eliminate any concerns about his non-appearance at future proceedings. Specifically, he apparently has leased an apartment in a residential building within the immediate vicinity of the court and has proposed to stay there and to pay to

have an around-the-clock private security detail stationed there to prevent his escape. In effect, he is proposing that he be held in a private, residential jail at his own expense, rather than in the uncomfortable public facility in which he is now confined.

Even putting aside concerns about dual standards of justice for the rich and the poor, this court concludes that Lui's proposal is wholly unsatisfactory. A residential apartment building is simply not designed to meet the unique security needs of a detention facility, and private security guards do not necessarily receive the same specialized training in escape prevention as professional corrections officers. Nor are such guards likely to have comparable levels of experience in dealing with escape schemes. In any event, they are certainly less accountable, if at all, for their errors and omissions. Further, if Lui were somehow able to escape from the private detention facility he proposes to establish, whether through the use of force, stealth, or corruption of the private guards who will be dependent upon him for their paychecks, it is fair to presume that the Hong Kong authorities would be justifiably dismayed to learn that security precautions had been compromised to make Lui's confinement more comfortable than that of ordinary detainees. On the basis of considerations such as these, Lui's novel proposal must be rejected.

### 2. Special Circumstances

Because Lui is not a "tolerable bail risk," it is unnecessary to give more than a brief explanation of why no special circumstance warrants the granting of bail here.

■ The purported special circumstance that Lui cites is the reversion of Hong Kong to PRC sovereignty on July 1, 1997, pursuant to the Joint Declaration of the Government of the United Kingdom of Great Britain and Northern Ireland and the Government of the People's Republic of China on the Question of Hong Kong, signed by both governments in 1984. (See Supplem. Mem. in Opp'n to Bail Ex. B, filed 1/17/96.) Lui claims that reversion favors his pre-hearing release be-

cause (1) the effect of reversion on this matter raises complex legal issues the consideration of which will cause this proceeding to be a lengthy one; and (2) the unlikelihood that he can be extradited, tried, and punished before sovereignty is transferred to a country with which the United States presently has no extradition treaty provides him with a strong defense to extradition.

As to the first reason, Lui has misread McNamara, and, therefore, Williams, to the extent he believes it stands for the sweeping proposition that bail is warranted whenever the existence of complex legal issues threatens to prolong the extradition process. McNamara merely suggests that bail may be warranted where the requesting authority is not prepared to go forward with the extradition hearing after having had reasonable time to prepare. See 46 F.2d at 84. In any event, the reversion issues that Lui would like the court to consider may be troubling, but, from a legal (as distinguished from a political) standpoint, they are not particularly complex. There is thus no reason to believe that, even if such issues are considered by the court, they will delay either the commencement or the completion of the judicial phase of the extradition process.

The court has three responses to Lui's second argument that he is likely to prevail on the merits of extradition because it is unlikely that he can be extradited, tried, and punished before the treaty under which his extradition is sought becomes a nullity. First, arguments by Lui based on the premise that sovereignty over Hong Kong will revert to the PRC in a mere seventeen months are not at all persuasive where, but for Lui's own decision to flee Hong Kong in April 1994 rather than stay and answer his accusers, the underlying criminal proceedings might be nearly—if not entirely—complete by now.

Second, the court is not persuaded that Lui is likely to prevail, at least at the judicial stage of the inquiry.[1] For him to do so based on reversion-related arguments, he

---

1. The court of course expresses no opinion about whether the Secretary of State might find Lui's arguments persuasive in light of diplomatic considerations, if the extradition process reaches that stage.

must first persuade the court that it should consider such arguments at all. Although the matter has not been fully briefed, there are some obvious reasons why it might not be appropriate for the court to do so. For example, it can be argued, by analogy to the doctrine of non-inquiry, *see Koskotas,* 931 F.2d at 173–74, that such arguments implicate foreign policy concerns that are more appropriately addressed to the Secretary of State pursuant to 18 U.S.C. § 3186 (1994), after the court makes the requisite finding under 18 U.S.C. § 3184 that "the evidence [is] sufficient to sustain the charge under the provisions of the proper treaty." *See generally In re Extradition of Tang Yee–Chun,* 674 F.Supp. 1058, 1068–69 (S.D.N.Y.1987).

Further, even if the court were willing to consider Lui's reversion-related arguments, it is doubtful that they would carry the day. For them to do so, Lui would have to persuade the court that it is not in the interest of justice or necessary for the maintenance of order in Hong Kong in the pre-reversion period for law enforcement authorities to press forward with all law enforcement activities, including the tracking down of all fugitives wherever they may have sought refuge. In the interest of comity and in consideration of treaty obligations, the court would probably give considerable deference to the judgment of Hong Kong authorities on this question. Even if the court were inclined to consider the matter de novo, however, it is unlikely that it would reach any different conclusion. For reasons of deterrence, if nothing else, law enforcement efforts must continue with at least the same intensity and vigilance as before, to assure that those who are disposed to commit crime not get the impression that they may do so with impunity.

■ Third, the court is not persuaded that strong likelihood of success is a special circumstance. In the ordinary case, it may have some bearing on risk of flight, because, all other things being equal, the stronger the case against a person, the more incentive such person has to attempt to escape. But the question whether a person is likely to flee is separate from the question whether special circumstances require that such person be released on bail. In any event, Lui poses a high risk of flight even after taking into account the strength of his arguments on the merits of extradition.

Aside from its possible impact on the risk of flight inquiry, there is no reason why likelihood of success should be taken into account at the detention stage of an extradition case. The fact that a person has a potentially winning defense to extradition does not make confinement any more of a hardship than it is for any other detainee. At most, it increases the probability that, at the end of the process, the accused will have prevailed, making his or her confinement that much more regrettable than it would otherwise have been. But that by no means suggests that the detention would have been in vain under such circumstances or that it would have failed to serve the purpose of assuring the presence of the accused at the extradition hearing. For this reason, likelihood of success may have some bearing on risk of flight, but it does not qualify as a special circumstance in foreign extradition cases.

## III. CONCLUSION

Because there is an appreciable risk that Lui will flee if he is released on even the most stringent conditions and because there is no special circumstance that will cause him to suffer extreme hardship relative to other detainees if he is not released, the government's motion to detain Lui is ALLOWED and Lui's motion to be released on conditions is DENIED.