## In the Matter of the EXTRADITION OF Heriberto GARCIA.

### Misc. Action No. L–10–027.

United States District Court,
S.D. Texas,
Laredo Division.

Dec. 30, 2010.

---

Christina Arellano–Villarreal, John Samuel Paul, Federal Public Defender Office of the Federal Public Defender, Laredo, TX, for Heriberto Garcia.

### MEMORANDUM AND ORDER

J. SCOTT HACKER, United States Magistrate Judge.

Pending before the Court is Heriberto Garcia's ("Garcia") "Motion for Bond Pending Extradition Hearing" (Dkt. No. 11) filed on November 19, 2010. After due consideration of the Parties' arguments and the applicable law, the Court concludes the motion for bond should be DENIED.

## I. BACKGROUND

On October 15, 2010, the Government initiated extradition proceedings against Garcia upon filing of their "Complaint for Provisional Arrest with a View Toward Extradition" (Dkt. No. 1) on behalf of the Mexican Government. The Government alleged that Garcia was wanted for the crime of homicide by Mexican authorities. (*See* Dkt. No. 1 at ¶ 5). Specifically, he is accused of shooting and killing Alfredo Salinas Colunga in Las Botellas bar in Nuevo Laredo, Tamaulipas, Mexico. (*See id.* at ¶ 6). Upon making the required probable cause determination, this Court issued an arrest warrant for Garcia in accordance with 18 U.S.C. § 3184 [1] and the

---

1.  18 U.S.C. § 3184 provides, in relevant part: Whenever there is a treaty ... for extradition between the United States and any foreign government ... any magistrate judge authorized so to do by a court of the United States ... on complaint made under oath, charging any person found within his jurisdiction, with having committed within the jurisdiction of any such foreign government any of the crimes provided for by such

United States–Mexico Extradition Treaty. (Dkt. No. 2). Consequently, Garcia was arrested on October 28, 2010. (*See* Dkt. No. 3).

On November 4, 2010, the Court issued a Scheduling Order for this case. (Dkt. No. 9). A detention hearing was held on November 15, 2010. The final extradition hearing is currently set for February 8, 2011.

## II. RELEVANT LAW

Federal district courts have almost exclusively, and by necessity, developed a federal common law to fill in the gaps left by current legislation for bail determinations in foreign extradition cases. *See, e.g., In re Extradition of Gonzalez,* 52 F.Supp.2d 725, 735 (W.D.La.1999). The federal extradition statute provides no explicit authority for a district court to grant bail to a potential extraditee. *See* 18 U.S.C. § 3184; *United States v. Ramnath,* 533 F.Supp.2d 662, 665 (E.D.Tex.2008). Similarly, the Bail Reform Act fails to provide any guidance as to how courts should handle bail requests in international extradition cases. *See* 18 U.S.C. § 3142 (creating a detailed procedural scheme for making bail determinations in domestic criminal cases). Furthermore, the extradition treaty at issue between the United States and the Republic of Mexico ("Mexico") does not grant a right to bail, does not outline bail procedures, and does not make any mention of bail. *See* Extradition Treaty, U.S.-Mex., May 4, 1978, 31 U.S.T. 5059. This lack of guidance has created contradictory, and often irreconcilable, lower court opinions on the subject of bail availability for defendants facing international extradition.

treaty ... issue his warrant for the apprehension of the person so charged, that he may be brought before such justice, judge,

### A. Creation of the Special Circumstances Standard

In its century-old and sole opinion on this subject, *Wright v. Henkel,* the Supreme Court recognized for the first time that a right to bail can exist in international extradition cases. 190 U.S. 40, 63, 23 S.Ct. 781, 47 L.Ed. 948 (1903). The Court stated that "while bail should not ordinarily be granted in cases of foreign extradition," it was unwilling to hold that the courts, "may not in any case, and whatever the special circumstances, extend the relief." *Id.* As interpreted by the lower courts, this language established the "special circumstances" test, which has become the standard for rendering bail decisions in international extradition cases. *See, e.g., In re Extradition of Russell,* 805 F.2d 1215, 1216 (5th Cir.1986) ("Bail should be denied in extradition proceedings absent 'special circumstances.' ") (citing *Wright,* 190 U.S. at 62–63, 23 S.Ct. 781).

The special circumstances test is interpreted as creating a presumption against bail in an international extradition case, which runs contrary to the presumption that favors bail in domestic prosecutions. *Russell,* 805 F.2d at 1216 (citing *Beaulieu v. Hartigan,* 554 F.2d 1, 2 (1st Cir.1977)). The government's strong interest in denying bail stems from its need to ensure that the United States fulfills its international treaty obligations. *See Wright,* 190 U.S. at 62, 23 S.Ct. 781. This is because extradition treaties create a binding obligation on the United States government to surrender fugitives to its treaty partners once they are found to be extraditable. *See id.* ("The demanding government, when it has done all that the treaty and the law re-

or magistrate judge, to the end that the evidence of criminality may be heard and considered.

quire it to do, is entitled to the delivery of the accused . . ., and the other government is under obligation to make the surrender."); *see also* Extradition Treaty, U.S.-Mex., art. 13, ¶ 3, May 4, 1978, 31 U.S.T. 5059 ("If the extradition is granted, the surrender of the person sought shall take place within such time as may be prescribed by the laws of the requested Party."). If a foreign fugitive was released by the United States and absconded pending extradition, the government would suffer "serious embarrassment," and this could create "potential reciprocal noncompliance by other countries." *Ramnath*, 533 F.Supp.2d at 665 (citing *Wright*, 190 U.S. at 62, 23 S.Ct. 781). The "paramount importance" of an extradition treaty supports denials of bail in foreign extradition cases. *See Jimenez v. Aristiguieta*, 314 F.2d 649, 653 (5th Cir.1963). The special circumstances test was established to allow for a limited number of cases to be eligible for bail because any risk of flight is too significant a risk for the national interest to tolerate. *See, e.g., Gonzalez*, 52 F.Supp.2d at 735 ("Bail is not ordinarily available in extradition cases due to the foreign relations interest of the United States in successfully returning persons subject to criminal prosecution to the requesting country.") (quoting *In re Extradition of Nacif–Borge*, 829 F.Supp. 1210, 1214 (D.Nev.1993) (internal quotations omitted)).

### B. The Problem with Identifying Special Circumstances

A review of the relevant case law most certainly demonstrates that what constitutes special circumstances is anything but clear. "Special circumstances" have never been specifically defined, but have only been described in the abstract, leaving trial courts with little to no guidance. *See Nacif–Borge*, 829 F.Supp. at 1214. Thus, bail decisions are contradictory and irreconcilable.[2] *See, e.g.*, Nathaniel A. Persily, *International Extradition and the Right to Bail*, 34 Stan. J. Int'l L. 407, 426 (Summer 1998) ("The case law regarding the criteria for pretrial release in extradition cases has been, to stay the least, inconsistent."); Christopher S. Kelly, *Bail in International Extraditions: How the "Special Circumstances" Standard has Become "Especially Confusing,"* 21 DCBA Brief 34, 36 (March 2009) ("[T]he cases are replete with contradictory and irreconcilable decisions, which only serve to further confuse the courts and muddy the law."); Joshua J. Fougere, *Let's Try This Again: Reassessing the Right to Bail in Cases of International Extradition*, 42 Colum. J.L. & Soc. Probs. 177, 188 (Winter 2008) ("[T]here is not one consistent legitimate special circumstance that warrants release on bail.").

Multiple factors have led to this convoluted "special circumstances" standard. *See* Kelly, *Bail in International Extraditions, supra*, at 36–37. First, as discussed

---

**2.** *Compare Nacif–Borge*, 829 F.Supp. at 1221 (availability of bail in extraditing country is a special circumstance) *with In re Extradition of Sutton*, 898 F.Supp. 691, 694–95 (E.D.Mo. 1995) (availability of bail in extraditing country is not a special circumstance); *Compare In re Extradition of Santos*, 473 F.Supp.2d 1030, 1037–38 (C.D.Cal.2006) (delay of less than one year is a special circumstance) *with In re Extradition of Heilbronn*, 773 F.Supp. 1576, 1581 (W.D.Mich.1991) (delay of less than one year is not a special circumstance);

*Compare In re Extradition of Huerta*, 2008 WL 2557514, at *4 (S.D.Tex. June 23, 2008) (poor health is a special circumstance) *with Nacif–Borge*, 829 F.Supp. at 1216–17 (poor health not a special circumstance); *Compare Gonzalez*, 52 F.Supp.2d at 736 (strong likelihood of success at extradition hearing is a special circumstance) *with In re Extradition of Lui*, 913 F.Supp. 50, 55 (D.Mass.1996) (likelihood of success at extradition hearing is not a special circumstance).

above, there is no clear authority on the issue of bail in international extradition proceedings. Second, it is not uncommon for defense attorneys to present a myriad of special circumstances in support of their client's bail application. *See, e.g.,* Nina Marino & Nicole Eiland, *Defending International Extradition,* 22 Crim. Just. 4, 7 (Winter 2008) (suggesting that the "best way to secure release pending the extradition proceedings is to throw in the proverbial kitchen sink"); *Ramnath,* 533 F.Supp.2d at 671 (recognizing that respondent's counsel "strain[s] too hard with specious arguments" and summarily rejecting "these patently gilded points"). This tactic results in courts considering, and recognizing or rejecting, more circumstances as "special." *See, e.g., Nacif–Borge,* 829 F.Supp. at 1210; *United States. v. Castaneda–Castillo,* 739 F.Supp.2d 49, 56-58, 2010 WL 3245424, at *7–8 (D.Mass. Aug. 17, 2010).

Third, there are very few circuit court bail decisions providing guidance to the lower courts.[3] This is because the bail decision quickly becomes moot. *See, e.g., In re Ghandtchi,* 705 F.2d 1315 (11th Cir. 1983) (vacating the appeal of a magistrate's bail order as moot where the extradition hearing was held and the party extradited before the circuit court could rule). Fourth, because circuit court decisions are scarce, the vast majority of bail opinions in international extradition cases are by magistrate and district court judges. These opinions hold no precedential value and are merely illustrative. As such, the "special circumstances" determination is a discretionary decision for the trial judge, and "the list of potential spe-

cial circumstances is not limited to those previously recognized in published decisions." *Gonzalez,* 52 F.Supp.2d at 736 (citing *Beaulieu,* 554 F.2d at 1). Put simply, the determination of whether a potential international extraditee has satisfied their burden to warrant bail is necessarily made on a case-by-case basis.

However, courts consistently agree that special circumstances are supposed to be limited to the most extraordinary circumstances and cannot involve factors applicable to all potential extraditees. *Gonzalez,* 52 F.Supp.2d at 735 (citing *In re Extradition of Smyth,* 976 F.2d 1535, 1535–36 (9th Cir.1992) (rejecting "need to consult with counsel, gather evidence and confer with witnesses" as an extraordinary special circumstance because "all incarcerated defendants need to do these things")). The special circumstances test is limited to apply where the need to grant bail is "pressing as well as plain," *In re Extradition of Russell,* 647 F.Supp. 1044, 1049 (S.D.Tex. 1986) (citing *In re Klein,* 46 F.2d 85, 85 (S.D.N.Y.1930)) and "when the requirements of justice are absolutely peremptory." *Id.;* (citing *In re Mitchell,* 171 F. 289, 289 (S.D.N.Y.1909)).

### C. The Interplay between Special Circumstances and Flight Risk

The case law also reflects an inconsistency among courts in their analysis of flight risk in relation to the "special circumstances" inquiry. Most courts treat flight risk as a separate, independent factor from the special circumstances analysis. These courts require the potential extraditee to establish the following two

---

**3.** For example, there are only two reported decisions in the Fifth Circuit specifically addressing the issue of bail in a foreign extradition case. *See Russell,* 805 F.2d at 1215 (briefly discussing the special circumstances test and rejecting that special circumstances justified granting bail in the case); *see also Jimenez,* 314 F.2d at 652–653 (rejecting appellant's request for an independent circuit court order admitting him to bail for failure to provide "special reasons" warranting "disturbing the lower court's order").

factors before the Court can grant bail in a foreign extradition case: (1) "special circumstances" exist in their particular case;[4] and (2) they are not a flight risk or a danger to the community. *See, e.g., Gonzalez,* 52 F.Supp.2d at 735; *Ramnath,* 533 F.Supp.2d at 665; *Huerta,* 2008 WL 2557514, at *1; *In re Extradition of Cervantes Valles,* No. M–02–008, 2002 U.S. Dist. LEXIS 26710, at *4 (S.D.Tex. May 13, 2002); *Santos,* 473 F.Supp.2d at 1035–36; *Castaneda–Castillo,* 739 F.Supp.2d at 55-56, 2010 WL 3245424, at *6; *In re Extradition of Molnar,* 182 F.Supp.2d 684, 687 (N.D.Ill.2002); *Nacif–Borge,* 829 F.Supp. at 1215. Under this approach, the lack of flight risk alone never justifies a potential extraditee's release pending an extradition hearing. *See, e.g., Ramnath,* 533 F.Supp.2d at 666; *Salerno v. United States,* 878 F.2d 317, 317–18 (9th Cir.1989). However, at least two courts have had difficulty in applying flight risk as a separate, independent factor from the special circumstances inquiry. *See Parretti v. United States,* 122 F.3d 758 (9th Cir.1997) (indicating that detention pending an extradition hearing without some indicia of flight risk violates the Due Process Clause), *withdrawn and appeal dismissed on other grounds,* 143 F.3d 508 (9th Cir. 1998) (en banc); *see also In re Extradition of Chapman,* 459 F.Supp.2d 1024, 1026–27 (D.Haw.2006) ("While this Court recognizes lack of flight risk as the initial threshold Respondents must cross, it is such a prominent aspect of this case that it rises to the level of a special circumstance in and of itself.").

This Court recognizes that flight risk is a crucial factor in determining whether a potential extraditee should be detained or released on bond. Nonetheless, this Court also recognizes that treating flight risk, as the majority of district courts do, as a separate and independent inquiry could be problematic. That is, treating flight risk as an independent factor from the special circumstances inquiry could, in theory, lead to absurd results. It is illogical to have a test where a potential extraditee can pose no risk of flight, but is required to be detained because of the lack of a so-called "special circumstance." At the other end of the spectrum, it is illogical to require the Court to analyze whether other special circumstances exist when it is almost a certainty that the potential extraditee will not appear at the extradition hearing if given a chance. Moreover, in *Russell,* the Fifth Circuit did not explicitly indicate that the bail determination consists of a two-pronged analysis involving a finding of special circumstances *and* a lack of flight risk. *See* 805 F.2d at 1216–17. Rather, the Circuit Court merely stated that "[b]eing a tolerable bail risk is not in and of itself a 'special circumstance.'" *See id.* at pg. 1217, *accord, United States v. Williams,* 611 F.2d 914, 915 (1st Cir.1979). As such, whether the test to grant bail in foreign extradition cases is a two-pronged analysis, or whether risk of flight is considered as part of the "special circumstances" inquiry, remains uncertain in the Fifth Circuit.

### D. The "Danger to the Community" Analysis

The case law also reflects a discrepancy among courts in their analysis of whether a potential extraditee is a danger to the community. First, some courts do consider "danger to the community," but they do so in a cursory fashion. *See, e.g., Ram-*

---

**4.** For those courts applying the two-pronged analysis, courts also differ as to whether the bail analysis properly begins with "risk of flight and danger" or "special circum-stances." *See Ramnath,* 533 F.Supp.2d at 665 n. 3; *Nacif–Borge,* 829 F.Supp. at 1215–16.

*nath,* 533 F.Supp.2d at 668; *Gonzalez,* 52 F.Supp.2d at 735 and 741; *Huerta,* 2008 WL 2557514, at *1; *Nacif–Borge,* 829 F.Supp. at 1214 and 1221; *Chapman,* 459 F.Supp.2d at 1027; *Santos,* 473 F.Supp.2d at 1035 and 1041; *Campillo Valles,* 36 F.Supp.2d at 1231; *Kin–Hong,* 926 F.Supp. at 1192; *In re Extradition of Beresford–Redman,* 753 F.Supp.2d 1078, 1087-88, 2010 WL 4910249, at *8 (C.D.Cal. Dec. 2, 2010); *In re Extradition of Bowey,* 147 F.Supp.2d 1365, 1368 (N.D.Ga.2001). Second, other courts indicate that "danger to the community" should be a consideration in determining whether a potential extraditee warrants bail, but fail to discuss whether that particular potential extraditee is a danger to the community. *See, e.g., Gullers v. Bejarano,* 2009 WL 250053, at *1 (S.D.Cal. Feb. 2, 2009); *Garcia v. Benov,* 2009 WL 6498194, at *3 (C.D.Cal. Apr. 13, 2009).

Third, other courts do not even address "danger to the community" as part of their bail determination. *See, e.g., Russell,* 805 F.2d at 1216; *Russell,* 647 F.Supp. at 1048–1050; *In re Extradition of Hamilton–Byrne,* 831 F.Supp. 287 (S.D.N.Y. 1993); *Cervantes Valles,* 2002 U.S. Dist. LEXIS 26710; *In re Extradition of Ye Gon,* 2009 WL 3336092, at *1 and *3 (D.D.C. Oct. 15, 2009); *Wroclawski v. United States,* 634 F.Supp.2d 1003 (D.Ariz. 2009); *United States v. DeLoera,* 2006 WL 1518981 (N.D.Ind. May 31, 2006); *Sacirbegovic,* 280 F.Supp.2d at 83 and 88; *Molnar,* 182 F.Supp.2d at 687; *In re Extradition of Maniero,* 950 F.Supp. 290 (S.D.Cal. 1996). Fourth, a few courts assert that the fact that the potential extraditee is not a danger to the community could constitute a special circumstance. *See, e.g.,*

*Chapman,* 459 F.Supp.2d at 1027; *United States v. Taitz,* 130 F.R.D. 442, 446 (S.D.Cal.1990). This serves to further illustrate the inconsistencies among the lower courts in bail determinations for foreign extradition cases.

### E. The Difficulty in Determining a Potential Extraditee's Burden in Establishing that Bail is Warranted

There is general agreement that the potential extraditee bears the burden of establishing a bond is warranted. However, there is disagreement among the federal district courts regarding the burden of persuasion that a potential extraditee must satisfy, which adds to the uncertainty of making a bond determination. For example, many courts simply do not comment on the exact evidentiary standard the potential extraditee must satisfy. *See e.g., Russell,* 805 F.2d at 1215; *Russell,* 647 F.Supp. at 1044; *Huerta,* 2008 WL 2557514, at *2 and *4; *Chapman,* 459 F.Supp.2d at 1024; *In re Extradition of Sacirbegovic,* 280 F.Supp.2d 81 (S.D.N.Y. 2003); *Cervantes Valles,* 2002 U.S. Dist. LEXIS 26710, at *4; *Sutton,* 898 F.Supp. at 691. Other courts require the person subject to international extradition to overcome the presumption against bail by presenting clear and convincing evidence that bail is warranted.[5] *See e.g., Nacif–Borge,* 829 F.Supp. at 1214–15; *Ramnath,* 533 F.Supp.2d at 665–66; *Gonzalez,* 52 F.Supp.2d at 725; *In re Extradition of Maniero,* 950 F.Supp. 290, 294 (S.D.Cal. 1996); *Castaneda–Castillo,* 739 F.Supp.2d at 55-56, 2010 WL 3245424, at *6; *Gullers,* 2009 WL 250053, at *1; *In re Extradition of Patel,* 2008 WL 941628, at *1 (D.Or. April 4, 2008). Finally, there is a negligi-

---

**5.** "Clear and convincing evidence is evidence that produces … a firm belief or conviction as to the matter at issue. This involves a greater degree of persuasion than is necessary to meet the preponderance of the evidence standard; however, proof to an absolute certainty is not required." Fifth Circuit Pattern Jury Instructions: Civil, Instruction No. 2.14 (West 2009 Revised).

ble minority of courts that have adopted a preponderance of the evidence standard.[6] *See, e.g., Santos,* 473 F.Supp.2d at 1036 n. 4 (explicitly rejecting clear and convincing evidence as the burden of persuasion and analyzing the request for bail under a preponderance of the evidence standard); *Benov,* 2009 WL 6498194, at *3.

In adopting the clear and convincing evidence standard, which many district courts have utilized, the *Nacif–Borge* court[7] looked to the provisions of the Bail Reform Act ("Act") and the Federal Rules of Criminal Procedure for guidance in making bail determinations in the foreign extradition context. 829 F.Supp. at 1215. That court ultimately determined that there were analogous situations that existed under the Act concerning: (1) bail for persons pending sentencing or notice of appeal,[8] (2) bail for persons convicted of certain serious offenses,[9] and (3) bail for persons in custody pending a revocation hearing for alleged violations of conditions of probation or supervised release.[10] *Id.* More specifically, the *Nacif–Borge* court believed that these three situations resembled the extradition situation in the lack of presumption for bail, and the need for the person seeking release to establish an absence of flight risk and danger by the

heightened standard. *Id.* While this Court is unwilling to declare that a potential extraditee's circumstances are analogous to that of a domestic criminal who has been convicted of a crime, the Court is persuaded, like the *Nacif–Borge* court, that the Bail Reform Act is, at least, informative to determining whether a heightened burden applies.

Moreover, there are other circumstances relevant to an extradition matter that support requiring a potential extraditee to meet a heightened burden in a request for bail. As explained above, our nation has important interests in (1) fulfilling its legal and binding obligations under its treaties with foreign governments, (2) avoiding any international embarrassment if our country were unable to fulfill those obligations, and (3) preventing any circumstances that would lead to potential reciprocal noncompliance by foreign governments. *See Wright,* 190 U.S. at 62, 23 S.Ct. 781; *Ramnath,* 533 F.Supp.2d at 665. It could be argued that a person who has committed a crime in a foreign jurisdiction, and subsequently left the jurisdiction, could be considered a flight risk by definition. *See* Fougere, *Let's Try This Again, supra,* at 189; Persily, *International Extradition, supra,* at 415. Further, it seems intuitive

---

**6.** To prove a fact by a preponderance of the evidence simply means to prove that the fact is more likely than not true. *See* Fifth Circuit Pattern Jury Instructions: Civil, Instruction No. 2.20 (West 2009 Revised); Fifth Circuit Pattern Jury Instructions: Criminal, Instruction No. 1.36 (West 2001).

**7.** *Nacif–Borge* is the first case explicitly adopting a clear and convincing evidence standard in bail requests for foreign extradition cases.

**8.** To be released on bail, persons convicted of domestic crimes pending sentencing or notice of appeal must prove to the court by "clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if re-

leased." *See* Fed.R.Crim.P. 46(c); 18 U.S.C. § 3143(1)(A).

**9.** A person convicted of a crime of violence, or an offense for which the maximum sentence is life imprisonment or death, or a drug offense with a maximum term of imprisonment of ten years or more, is automatically detained. *See* 18 U.S.C. § 3143(b)(2).

**10.** 18 U.S.C. § 3143 is applicable to any person in custody pending a revocation hearing for alleged violations of conditions of probation or supervised release. *See* Fed.R.Crim.P. 32.1(a)(6). Thus, a person in custody pending a revocation hearing must establish that he will not flee by clear and convincing evidence. *Id.*

to this Court that a potential extraditee is a greater risk of flight (than someone accused in a domestic criminal case) because there is less, if any, familiarity with the foreign country's laws and/or legal processes.

## III. ANALYSIS

In the instant motion, Garcia argues that he is not a flight risk or a danger to the community. (*See* Dkt. No. 11 at pg. 2–4). In addition, he argues that "special circumstances apply that warrant [his] release on bond." (*See id.* at pg. 4). The special circumstances provided by Garcia are as follows: (1) serious health issues for which he cannot receive adequate treatment in jail; and (2) a pending Texas Workers' Compensation claim. (*Id.* at pg. 4–5).

### A. Whether Garcia is a Flight Risk and/or a Danger to the Community

#### 1. Facts Supporting Garcia's Risk of Flight and that He is a Danger to the Community

▮ The Court recognizes that there are several facts that indicate Garcia is a flight risk and a danger to the community. First, during his interview with the Pretrial Services Officer,[11] Garcia stated that if he were extradited to Mexico, he would be killed by Mexican authorities because he was a government informant. He further explained to the officer that he did not want to be extradited because he feared an inhumane death. Garcia's desire to avoid an inhumane death gives him a strong reason to flee to avoid extradition.

Second, the Court notes that Garcia is charged with homicide under Articles 329,

333, and 337 of the Penal Code of the State of Tamaulipas. (*See* Dkt. No. 1 at ¶ 5). Under Article 333, a person convicted of simple intentional homicide can be imprisoned from eight to sixteen years. (*See* Dkt. No. 10, Ex. 40). Article 337 further sets out that a person convicted of aggravated homicide can be confined from twenty to fifty years in prison. *Id.* Thus, the fact that Garcia is charged with a crime of violence and is facing a substantial amount of time in the Mexican prison system further increases his risk of flight and also indicates that he is a danger to the community.

Third, Garcia has no incentive to answer the pending charges in Mexico. As reflected in his Pretrial Services Report, Garcia has virtually no ties to Mexico. Garcia is a thirty-six year old Naturalized United States citizen, and he has lived in the United States for the last twenty-five years. Garcia's parents and siblings, except for a brother that is in the custody of the United States Bureau of Prisons, all live in Laredo, Texas. While Garcia is married to a Mexican national, it appears that both he and his wife have resided in the United States for the length of their marriage. All four of Garcia's children are United States citizens, attending school in Laredo, Texas. Garcia further indicated that he has no family members residing in Mexico. He has no assets in Mexico. Moreover, Garcia claims that he last visited Mexico about five years ago to go shopping. Again, this is an indication that Garcia is a flight risk.

Fourth, as previously noted from the Pretrial Services Report, Garcia does have ties to the Laredo community. He and his family have lived in Laredo for a signifi-

---

11. The Court received the information regarding Garcia's comments about his fear of extradition through the Pretrial Services Memorandum filed in response to Garcia's instant

motion. The officer, who authored the report, informed the Court that both Garcia's attorney and the Government's attorney had been made aware of the information.

cant period of time. However, Garcia has been unemployed for two years. Garcia advises that he received his last unemployment check about two weeks prior to his arrest. He is currently renting a home, and claims that he has no financial assets. Further, from the Pretrial Services Report, Defendant's wife appears not to have any legal status to be residing in the United States. Typically, these are not the type of community ties that prevent someone, who is facing a homicide charge in Mexico, from fleeing to avoid extradition to Mexico.

Fifth, Garcia's criminal history consists of two felony drug convictions ("Narcotic smuggling" and "Possession with intent to distribute less than 50 kilograms of marijuana, Case No. 5:01–CR1359–01"), a misdemeanor conviction for driving while intoxicated, and two other arrests that are drug related offenses. Regarding the first arrest, on July 3, 2005, Garcia was arrested for driving while intoxicated. *See* Case No. 5:01–CR–1359–01, Dkt. No. 26. After a routine strip search, a sheriff's deputy found a small bag of cocaine in Garcia's underwear. *Id.* Garcia's second arrest, on August 21, 2005, entailed a Georgia State Police Officer arresting him when two duffle bags, which contained 220 pounds of cocaine, were discovered in his tractor-trailer. *Id.* Moreover, these two arrests occurred while Garcia was serving a term of federal supervised release in Case No. 5:01–CR1359–01. *See* 5:01–CR–1359–01, Dkt. Nos. 24, 25, and 26. On other occasions, Garcia violated his conditions of supervised release, when he tested positive for cocaine use on October 13, 2004 and November 17, 2004. *Id.* As a result, the court ordered Garcia to be placed at a local half-way house where he was subsequently

discharged due to being a safety risk to staff personnel and inmates.[12] *Id.* Here, Garcia's criminal history and how he comported himself while out on conditions of supervised release on his previous federal offense indicate that he is a danger to the community.

### 2. *The Bail Reform Act: Garcia's Arguments that He is not a Flight Risk or a Danger to the Community*

In support of his argument that he is not a flight risk or a danger to the community, Garcia asks the Court to look to the provisions of the Act for guidance. (*See* Dkt. No. 11 at pg. 3 (citing *Ramnath*, 533 F.Supp.2d at 667)). Under the Act, courts are required to consider the following factors in a domestic criminal case to determine whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community: (1) the nature and circumstances of the offense charged (including whether it is a crime of violence), (2) the weight of the evidence against the person, (3) the history and characteristics of the person, and (4) the nature and seriousness of danger to any person or community that would be posed by the person's release. 18 U.S.C. § 3142(g).

The Court notes that only a few courts have considered these factors under the Act in making flight risk determinations in international extradition cases. *See, e.g.*, *Ramnath*, 533 F.Supp.2d at 667–71 (stating that the Act "provides a helpful framework of reference" and specifically applying each of the four factors); *Nacif–Borge*, 829 F.Supp. at 1221–22 (recognizing that [the Act] "provides a detailed outline of traditional factors used to assess risk of flight"); *Santos*, 473 F.Supp.2d at 1040–41

---

12. Interestingly, the homicide in Mexico, which Garcia is alleged to have been involved, occurred while he was on federal supervised release in Case No. 5:01–CR–1359–01.

(looking to the Act's factors in "assessing the risk that a potential extraditee seeking release on bail will intentionally fail to appear for further extradition proceedings"); *In re Extradition of Campillo Valles*, 36 F.Supp.2d 1228, 1231 (S.D.Cal. 1998) (stating that "the dictates of the [Act] do not *strictly* apply" and broadly considering the factors); *Kin–Hong v. United States*, 926 F.Supp. 1180, 1189 (D.Mass.1996) (stating that the Act's "standards for evaluating an individual's risk of flight provide a useful frame of reference" without specifically considering each enumerated factor). In contrast, many courts do not even consider the factors in their analysis of flight risk. *See, e.g., Beresford–Redman*, 753 F.Supp.2d at 1086-87 and 1091, 2010 WL 4910249, at *7 and *12; *In re Extradition of Ye Gon*, 2009 WL 3336092, at *1 and *3 (D.D.C. Oct. 15, 2009); *Molnar*, 182 F.Supp.2d at 687; *Sacirbegovic*, 280 F.Supp.2d at 83 and 88; *Gonzalez*, 52 F.Supp.2d at 735; *United States v. Wroclawski*, 574 F.Supp.2d 1040, 1044 (D.Ariz.2008); *De Loera*, 2006 WL 1518981, at *2–4; *Bowey*, 147 F.Supp.2d at 1367–68; *Maniero*, 950 F.Supp. at 293–94. This Court acknowledges that the above-mentioned factors may be relevant to some degree. However, it also recognizes that a mechanical application of these factors alone is an untenable means of determining whether to grant bail to a potential extraditee awaiting their foreign extradition hearing.

### i. The "Weight of the Evidence" Factor

To support his contention for a bond, Garcia first addresses the "weight of the evidence" factor under the Act. Here, Garcia simply summarizes the facts of the case and argues that the evidence against him related to those charges "is not strong." (*See* Dkt. No. 11 at pg. 5). Although the "weight of the evidence" factor is important in considering bail, it must be considered in its proper context—that is, whether it is a domestic criminal case or an international extradition case.[13]

Normally, in a domestic criminal case, the "weight of the evidence" factor is the least important of the various factors under the Act when used to buttress a decision to detain a defendant. *United States v. Chen*, 820 F.Supp. 1205, 1207 (N.D.Cal. 1992) (citation omitted). However, if the evidence is weak, it becomes an important factor favoring release on bond. *Id.* (citation omitted). "The evidence of guilt [or innocence] is relevant only in terms of the likelihood that the defendant will fail to appear." *Id.* at 1207–08 (citing *United States v. Winsor*, 785 F.2d 755, 757 (9th Cir.1986)). For instance, in a domestic criminal case, the Court has to assure a defendant's presence in a future, domestic court proceeding where ultimately a defendant's guilt will be determined. At that future hearing, the Government has to prove a defendant's guilt beyond a reasonable doubt. Considering the Govern-

---

**13.** Garcia suggests that the Court evaluate the Mexican Government's case against him to determine whether the "weight of the evidence" factor weighs in favor of his release. The Court notes, however, the general principle that "the judicial branch should not ordinarily inquire into the criminal procedures of other countries." *See In re Extradition of Sidali*, 899 F.Supp. 1342, 1351 (D.N.J.1995) (citing *Neely v. Henkel*, 180 U.S. 109, 21 S.Ct. 302, 45 L.Ed. 448 (1901)). The Court is of the opinion that it is inappropriate for it to step into the shoes of the Mexican judiciary and apply Mexican laws and criminal procedure to evaluate the strength of that government's case in convicting Garcia so that this Court can evaluate flight risk. As such, the Court's flight risk analysis will focus only on the strength of the case, applying the laws and procedures of this country, as it relates to our Government's ability in proving probable cause at the extradition hearing. *See generally* Extradition Treaty, U.S.-Mex., art. 3 and art. 10, ¶ 3, May 4, 1978, 31 U.S.T. 5059

ment's high burden in prosecuting a criminal case, it is only logical that, if the Government's case is weak, a defendant's appearance in the domestic court is more likely. In other words, if a defendant's likelihood of success is strong in a domestic criminal case, then, it is more likely that a defendant will appear in a future court proceeding.

Even assuming *arguendo*, that the evidence is "not strong," in the context of an extradition proceeding, the "weight of the evidence" factor does not favor Garcia's release. Here, the Court has to assure Garcia's presence at an extradition hearing, where the Government's burden of persuasion is much lower than that in a domestic criminal case. In this type of proceeding, the Government's burden is the probable cause standard—determined according to the laws of the requested Party.[14] Extradition Treaty, U.S.-Mex., art. 3 and art. 10, ¶ 3, May 4, 1978, 31 U.S.T. 5059; *see Gonzalez*, 52 F.Supp.2d at 736. By analogy, for the "weight of the

evidence" factor to have significance in the Court's bail decision, the Government's case would have to be weak in its ability to meet its burden of proof—the probable cause standard. Put simply, if the Government's case is weak in being able to demonstrate probable cause, then a potential extraditee's appearance in an extradition hearing is more likely.[15] Conversely, if the Government's case is strong in demonstrating probable cause, then a potential extraditee's appearance is less likely and could indicate a risk of flight.

Under this probable cause standard, the Government must show evidence "sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the accused's guilt." *Id.* (internal quotations omitted) (citations omitted). Summarizing the facts from Garcia's motion, it appears undisputed that, on January 8, 2005, a person was murdered in a bar in Mexico. Two witnesses identified Garcia as being present in the bar that day. A third witness, who

---

**14.** The United States–Mexico Extradition Treaty specifies that the standard to be applied at the extradition hearing is that of the *requested* country—the United States.

> Extradition shall be granted only if the evidence be found sufficient, *according to the laws of the requested Party*, either to justify the committal for trial of the person sought if the offense of which he has been accused had been committed in that place or to prove that he is the person convicted by the courts of the requesting Party.

Extradition Treaty, U.S.-Mex., art. 3, May 4, 1978, 31 U.S.T. 5059 (emphasis added); *see Gonzalez*, 52 F.Supp.2d at 736. The evidence required for extradition is again addressed in a subsequent section of the Treaty.

> In addition, when the request for extradition relates to a person who has not yet been convicted, it shall be accompanied by ... [e]vidence which, *in accordance with the laws of the requested Party*, would justify the apprehension and commitment for trial of the person sought if the offense had been committed there.

Extradition Treaty, U.S.-Mex., art. 10, ¶ 3, May 4, 1978, 31 U.S.T. 5059 (emphasis added); *see Gonzalez*, 52 F.Supp.2d at 736. Thus, the standard to be applied at the extradition hearing is that of probable cause as used in federal preliminary proceedings. *Gonzalez*, 52 F.Supp.2d at 736 (citing *Sindona v. Grant*, 619 F.2d 167, 175 (2nd Cir.1980)).

**15.** The Court notes that typically a "sufficiency of the evidence" type of analysis is raised in the extradition context when a potential extraditee attempts to show that he or she will have a likelihood of success at the extradition hearing, thus, demonstrating to the court that there is a special circumstance warranting bail. *See, e.g., Gonzalez*, 52 F.Supp.2d at 736; *Huerta*, 2008 WL 2557514, at *2–3 and *4–5; *Castaneda–Castillo*, 739 F.Supp.2d at 61-62, 2010 WL 3245424, at *11; *Santos*, 473 F.Supp.2d at 1038–39; *Wroclawski*, 634 F.Supp.2d at 1008–1009. Here, however, Garcia has not set forth a "likelihood of success" argument as a potential special circumstance.

observed "the shooting," identified Garcia as "the shooter." Further, the Mexican police found Garcia's Dodge Ram pickup truck in a nearby parking lot. Without any assertions from Garcia that this evidence is unreliable, the Court cannot simply conclude that the evidence is weak. As such, considering the Government's lower burden of persuasion in the context of an extradition proceeding, the Court finds Garcia's argument (that the evidence is not strong) unpersuasive.

### ii. "History and Characteristics of the Person"

Furthermore, when addressing the "history and characteristics of the person" factor under the Act, Garcia insinuates that he is not a flight risk because he has been aware of the murder investigation in Mexico since January 10, 2005 and has made no attempt to "flee, disappear, or distance himself" from Laredo, Texas. (*See* Dkt. No. 11 at pg. 4). Again, the Court finds Garcia's reasoning to have little merit. The Court notes that there is an international border separating Garcia and the jurisdiction that would be prosecuting him for the alleged crime. Consequently, from the time Garcia was made aware of the investigation, up to the time the Court issued a provisional arrest warrant, there was not an immediate threat that the Mexican authorities would be able to secure Garcia's presence in Mexico in order to prosecute him for that crime. *See e.g., Russell*, 647 F.Supp. at 1049–50 (finding that the potential extraditee "did not face imminent extradition" until the complaint for provisional arrest was filed). As such, until the provisional arrest warrant was issued by the Court, there was little, if any, reason for Garcia to flee or disappear.

Garcia further argues that he would not flee to Mexico because that is where the

foreign warrant is pending for his arrest. (November 15, 2010 Hearing at 11:00:18). The Court's concern, however, is not that Garcia is going to flee to Mexico—the country seeking to prosecute him—but rather that he will flee into the interior United States, Canada, or another country where extradition is not permitted to avoid potential extradition to Mexico.

### iii. Danger to the Community

Finally, in his motion for bond, Garcia argues that there is no indication from his criminal history that he is a danger to the community because he lacks a history of violence or firearm possession. (*See* Dkt. No. 11 at pg. 4). Garcia further argues that the Court could release him on an electronic monitor. (*Id.* at 10:59:25). To bolster his request for a bond in this matter, Garcia informs the Court that he has a lot in San Ygnacio, Texas, presumably a property he can post as collateral. (*Id.* at 11:09:40).[16]

However, danger to the community does not refer only to the risk of physical violence. *United States v. Tortora*, 922 F.2d 880, 884 (1st Cir.1990) (citing S.Rep. No. 225, 98th Cong., 2d Sess. 4–12, *reprinted in* 1984 U.S.Code Cong. & Admin.News 3182, 3187–95). As noted above, Garcia has two felony drug convictions. The very nature of drug offenses constitutes a danger to the community. *United States v. Derrow*, 6 F.Supp.2d 615, 616 (E.D.Tex. 1998). Moreover, while he was out on federal supervised release regarding one of those convictions, he was arrested two more times for drug related offenses and allegedly committed a homicide, which is the subject of the extradition proceeding. On other occasions, Garcia violated his conditions of supervised release when he tested positive for cocaine use. By any

---

**16.** The Court notes that, during the Pretrial Services Officer's interview, it appears that

Garcia did not disclose to the officer that he had this asset.

realistic measure, Garcia's history is a telling indicator that he cannot be trusted to abide by any conditions of release. Therefore, even considering the Act's factors, as Garcia suggests, the Court is not persuaded that Garcia is not a flight risk and is not a danger to the community.

**B. There are no Special Circumstances Warranting Garcia's Release**

**1. Garcia's health conditions do not rise to a level that justify releasing him on bail**

Garcia contends that he is suffering from serious health issues for which he cannot receive adequate treatment in jail. On August 23, 2010, Garcia had back surgery where he had three spinal disks removed due to a work-related accident. (Dkt. No. 11 at pg. 4–5). He claims that his doctor told him that therapy was necessary "in order for the surgery to work." (November 15, 2010 Hearing at 11:01:50). He goes on to say that he is in danger of losing the movement of his left leg due to a pinched nerve that is "causing [him] a lot of problems." (*Id.* at 11:02:04). According to Garcia, prior to the surgery, he was confined to a wheel chair because of back pain. (*Id.*). Consequently, his neurosurgeon referred him to a pain management specialist. (Dkt. No. 11, Ex. 3). In addition, he has a large, red growth on the back of his neck. (Dkt. No. 11 at pg. 4). His primary care physician has referred him to a surgeon regarding this growth. (Dkt. No. 11, Ex. 2).

The Court recognizes that certain medical concerns may or may not constitute special circumstances. *See, e.g., Huerta,* 2008 WL 2557514, at *2 and *4 (Mellitus Diabetes, digestion problems, prostate problems, high blood pressure and anemia are not life-threatening and do not constitute special circumstances) (a life-threatening chronic heart condition, high blood pressure, coronary artery disease, prostate cancer and frequent blood clots, all supported by doctor's affidavit, constitute special circumstances); *Nacif–Borge,* 829 F.Supp. at 1217 (health condition is not a special circumstance because it is not debilitating and is easily controlled even though he only has one kidney and requires a special diet); *In re Extradition of Rouvier,* 839 F.Supp. 537, 541 n. 9 (N.D.Ill. 1993) (special circumstances did not exist when respondent admitted that medical condition is merely "potentially serious" and could be controlled with medication). Reliable and quantifiable evidence, including documented medical evidence from a physician, could suffice for an adequate showing. *See, e.g., Nacif–Borge,* 829 F.Supp. at 1217. However, if most health problems constituted special circumstances serving as a basis for release, both genuine and fabricated illnesses could potentially empty federal prisons. *Hamilton–Byrne,* 831 F.Supp. at 290–291 (S.D.N.Y.1993).

In this matter, Garcia has not provided sufficient detail regarding his condition or his medical treatment needs to convince the Court that the severity of his condition is a special circumstance warranting release on bond. That is, the exhibits provided by Garcia do not sufficiently explain to the Court that his condition is either life-threatening or so serious that his medical needs cannot be accommodated by the United States Marshal's Service while in custody. His exhibits simply support his assertions that he has received medical treatment and has been referred to specialists by other physicians. (*See* Dkt. No. 11, Ex. 2 and 3). As such, while the Court does not question the seriousness of Garcia's medical conditions, they do not appear to be life-threatening, or so complex as to be beyond the capacity of federal

authorities to manage while he is in their custody.

## 2. Garcia's pending Texas Workers' Compensation claim is not a special circumstance

Finally, Garcia informs the Court that he has a worker's compensation claim (relating to his back problems) pending before the Texas Department of Insurance—Division of Workers' Compensation ("Division"). (See Dkt. No. 11 at pg. 5). Garcia asserts that he is representing himself (pro se) in this matter and that his release on bond is necessary, because there is no one else who can attend a contested hearing to pursue his claim.[17] Further, Garcia argues that, if he is unable to pursue his claim as a result of his detention, his family could be denied financial benefits of which he would be entitled.

The Court concludes that Garcia's need to pursue his pending workers' compensation claim is not a "special circumstance" to warrant his release. Here, the Court notes that Garcia can make arrangements for any pending matters (before the Division) over the phone, including arranging for telephonic hearings if he notifies the Division in advance. See Tex. Workers' Compensation Comm'n Appeal No. 013216, 2002 WL 34360822, at *2 (Feb. 7, 2002) (suggesting the possibility of a telephonic appearance if the claimant is not free to attend in person and holding that it was "manifestly unjust" for hearing officer to continue with hearing when incarcerated claimant advised the hearing officer of her incarceration before hearing date); see also Tex. Workers' Compensation Comm'n Appeal No. 92674, 1993 WL 98760, at *1 (Jan. 29, 1993) (incarcerated claimant participated in the hearing via teleconference call).

Moreover, Garcia's concern that, as a result of his detention, his family may be denied future financial benefits is questionable. Even if the Court were to release him pending the extradition hearing to allow him to pursue his claim, such efforts may ultimately prove fruitless. This is because if Garcia is ultimately extradited to Mexico, he may not be eligible to receive workers' compensation benefits while he is incarcerated. The Texas Workers' Compensation Commission has consistently held that an injured employee is not eligible for benefits during the period of incarceration. See e.g., Tex. Workers' Compensation Comm'n Appeal No. 011061, 2001 WL 1461664, at *2 (June 20, 2001); see also Tex. Workers' Compensation Comm'n Appeal No. 002599, 2000 WL 33128034, at *1–2 (Dec. 13, 2000); see also Tex. Workers' Compensation Comm'n Appeal No. 92674, 1993 WL 98760, at *4–5 (Jan. 29, 1993); see also Tex. Workers' Compensation Appeal No. 92428, 1992 WL 324407, at *3 (Oct. 2, 1992).

The Texas Labor Code defines "disability" in Section 401.011(16) as "the inability because of a compensable injury to obtain and retain employment" at the pre-injury wage. In Texas Workers' Compensation Commission Appeal No. 002599, the Commission noted that disability is an economic concept and that if an injured employee becomes incarcerated (wrongfully or not) the actual loss of wages is attributable to such incarceration, which is the reason for the inability to obtain and retain employment rather than the compensable injury. 2000 WL 33128034, at *1; see also Texas Workers' Compensation Comm'n Appeal No. 92428, 1992 WL 324407, at *3; Texas Workers' Compensation Comm'n Appeal No. 92674, 1993 WL 98760 at *4.

---

17. On November 29, 2010, the Court issued a short order advising Garcia that he needed to make alternate arrangements with the Division regarding a previously scheduled contested case hearing on December 8, 2010. (See Dkt. No. 13).

In Appeal No. 92674, the Commission held, in part:

> [Temporary income benefits] are to replace lost wages due to a compensable injury. In this case, actual loss of wages became directly attributable to the claimant's incarceration since he cannot earn wages while incarcerated. In our opinion, incarceration, and not the compensable injury, has become the reason for the claimant's inability to obtain and retain employment at wages equivalent to the preinjury wage.

Texas Workers' Compensation Comm'n Appeal No. 92674, 1993 WL 98760 at *5.

Thus, due to the improbability of Garcia receiving any benefits during his period of incarceration and the fact that the Division allows him the opportunity to make arrangements for any pending matters via telephone, Garcia's pending workers' compensation claim is not a "special circumstance" that warrants his release.

## IV. CONCLUSION

The Court finds that Garcia has not demonstrated (1) that he is not a flight risk and not a danger to the community, and (2) that there are special circumstances that warrant his release on bond. Although the Court believes that the potential extraditee's burden of proof to overcome the presumption against bail is "by presenting clear and convincing evidence," the Court notes that Garcia did not even satisfy his burden under the lesser "by a preponderance of the evidence" standard, which is utilized by a small minority of federal district courts.

The Court believes that Garcia's risk of flight is beyond a "tolerable risk." He has virtually no incentive to appear at his extradition hearing, where, due to the Government's low burden of proof, there are significant risks that he will be formally extradited to Mexico. Garcia fears that he will experience an inhumane death by Mexican authorities if he is ultimately extradited. The Mexican Government intends on prosecuting Garcia for the crime of homicide, for which he could be facing a significant period of incarceration. He has no substantial ties to Mexico. Further, Garcia has demonstrated that he is likely not to comply with court-imposed conditions of release. Finally, the nature of the charge pending against Garcia in Mexico and his previous criminal history in this country both indicate that he is a danger to the community.

Moreover, the Court finds that Garcia does not have "special circumstances" that merit his release. Regarding his health issues, Garcia does not sufficiently explain to the Court that his condition is either life-threatening or so serious that his medical needs cannot be accommodated by the United States Marshal's Service while in custody. In addition, Garcia's detention in this matter simply does not prevent him from pursuing his worker's compensation claim.

As such, Garcia's "Motion for Bond Pending Extradition Hearing" (Dkt. No. 11) is DENIED.

IT IS SO ORDERED.